**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **JANE DOE,**<br><br>    **PLAINTIFF,**<br><br>**v.**<br><br>**PROSKAUER ROSE LLP,**<br><br>    **DEFENDANT.** | **COMPLAINT**<br><br>**Case No. _____** |

Plaintiff Jane Doe is a partner at Proskauer Rose LLP, an international law firm with an office in Washington, D.C.  Plaintiff is the ██████████████████████████ ████████████████  Plaintiff brings this action to remedy discrimination, retaliation, and other harms she has suffered and continues to suffer at Proskauer.

## I.   <u>OVERVIEW</u>

1.      Defendant Proskauer Rose LLP is one of the highest-grossing law firms in the world.   According to *The American Lawyer*, Proskauer's gross revenue was $852.5 million in 2016, with average profits per equity partner of $2.315 million.[1]   Almost all aspects of Firm management and operations are tightly controlled by Proskauer's currently all male Executive Committee.

2.      Proskauer professes – to its attorneys, the legal community, and the public at large – that it has a deep commitment to "equal opportunity and diversity in the practice of law," as well as "corporate social responsibility" and "legal justice."   As part of this commitment, Proskauer claims to have "long championed the professional development and career advancement of

---

[1]   *See 2017 Am Law 100*, THE AMERICAN LAWYER (Apr. 26, 2017), http://www.americanlawyer.com/id=1202784616627.

women."  Behind the curtain, however, the reality is far less flattering: in fact, Proskauer faces a serious gender discrimination problem that it has repeatedly failed – and indeed refused – to fix.

3.        Even by BigLaw standards, the number of female partners at Proskauer is very low. Only 13% of Proskauer's equity partners are female, compared to an estimated 18% of equity partners in BigLaw generally.[2]  Even within the ranks of equity partners at Proskauer, there are substantial gender disparities.  The Firm's five highest paid male partners earn more than double the amount that the five highest paid female partners earn.

4.        Since Plaintiff joined the firm in 2013, she has been among Proskauer's hardest-working and most productive equity partners.

5.        During her time at Proskauer, however, Plaintiff has been overtly objectified based on her sex.  Proskauer Chairman Joseph Leccese frequently complimented Plaintiff's appearance, describing her as "elegant" and "glamorous" and praising her "presence" and ability to "light up a room."

6.        Ralph C. Ferrara, who is a prominent securities litigator in Proskauer's D.C. office, has been far blunter.  Almost every time he saw Plaintiff in the office, he made suggestive or inappropriate comments about her appearance.  He drew close to her in a lascivious manner and made inappropriate comments regarding her appearance, body, clothing, or "sexiness."  Plaintiff complained to Proskauer's General Counsel, Stephen Obus, about inappropriate statements that Mr. Ferrara made to Plaintiff and to and about summer associate candidates, but the Firm took no action to discipline Mr. Ferrara or stop his harassment.  Indeed, Mr. Ferrara's conduct has continued unabated since Plaintiff complained.

---

[2] *See* National Association of Women Lawyers, NAWL NINTH ANNUAL SURVEY, *available at* http://www.nawl.org/p/cm/ld/fid=506 (surveying female partnership rates at AmLaw200 firms).

7.      Despite her stand-out performance, Proskauer discriminated against Plaintiff based on her gender, paying her *millions of dollars* less than male partners who are similarly or less productive than she is.  The Firm simultaneously discriminated against Plaintiff – a single mother who has sole custody over her son – based on her status as a female caregiver and based on her taking of statutorily protected leave.  For example:[3]

a.      In 2016, the Firm set the annualized pay of a new male partner at *approximately 65% more* than Plaintiff, even though the new male partner's client originations were approximately 63% of Plaintiff's and he had no track record at Proskauer.

b.      From 2014 through 2016, the Firm paid another male partner 55% more than Plaintiff, even though his client originations were 79% of Plaintiff's, his billable hours were 55% of hers, and his total hours were approximately 88% of hers.

c.      From 2014 through 2016, the Firm paid another male partner 40% more than Plaintiff, even though his client originations were just 9% of Plaintiff's, his billable hours were 47% of hers, and his total hours were 62% of hers.

d.      From 2014 through 2016, the Firm paid another male partner 40% more than Plaintiff, even though his client originations were approximately the same as Plaintiff's, his billable hours were 55% of hers, and his total hours were 77% of hers.

8.      When Plaintiff engaged in protected activity and complained that her pay was inequitable compared to her male peers, Proskauer retaliated against her instead of providing redress.  Proskauer aggressively rebuked her, excluded her from client development activities and firm leadership, treated her in a hostile manner, damaged her client relationships, isolated her from

---

[3] The names of the male partners referenced in Paragraphs 7(a)-(d) of this Complaint have been provided to Defendant separately.

her peers and team members, demeaned her to her peers and clients, denied her access to almost all of the Firm's client files, refused to assign her to work on Firm-client matters except those she originated, barred from all Firm partner meetings and functions, including the Firm retreat, and refused to increase her pay to a level commensurate with her substantial contributions.

9.      Then, after Plaintiff retained counsel and informed Proskauer that she was prepared to bring litigation, Proskauer further retaliated by threatening to terminate her, stating, "you need to understand… you are going to be terminated. Your complaint upset a lot of people."

## II.    **THE PARTIES**

10.     **PLAINTIFF JANE DOE** ("Plaintiff") has been a partner at Proskauer Rose LLP since ███████.  At all times relevant to this action, Plaintiff has been a covered "employee" under the statutes invoked in this action.  At all times relevant to this action, Plaintiff was based out of Proskauer's Washington, D.C. office.  She has also performed substantial work in Maryland for clients in Maryland or with business in Maryland, including attending client meetings, agency meetings, mediations and depositions and appearing in Court.

11.     **DEFENDANT PROSKAUER ROSE LLP** ("Proskauer" or the "Firm") is a large international law firm with multiple offices across the country and over the globe.  While Proskauer's principal office is located in Manhattan, Proskauer also maintains an office in Washington, D.C.  Proskauer is subject to, *inter alia*, the New York Rules of Professional Conduct and the D.C. Rules of Professional Conduct, both of which prohibit discrimination in the practice of law on the basis of sex.

## III.   **JURISDICTION AND VENUE**

12.     This Court has subject matter jurisdiction over this suit pursuant to 28 U.S.C. § 1331 because this action is based on the Equal Pay Act of 1963, 29 U.S.C. § 206(d), and the

Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq*. This Court has supplemental jurisdiction

over Plaintiff's other claims pursuant to 28 U.S.C. § 1367.

13.     Venue is proper in this District under 28 U.S.C. § 1391(b).  Proskauer has an office

in this District and transacts substantial business in this District on an ongoing basis.  A substantial

part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## IV.     <u>FACTUAL ALLEGATIONS</u>

### A.     *Plaintiff's Outstanding Performance Record*

14.     Plaintiff is a member of the bars of the District of Columbia, the Commonwealth

of Virginia, the State of Maryland, and the Supreme Court of the United States.

15.     Plaintiff has worked at Proskauer Rose LLP since ███████████ as an equity

partner in the Firm's ████████████ Law Department in Washington, D.C.

16.     In Proskauer's press release announcing her hire, Plaintiff was described as █████

█████████████████████████████████.  Her hire was characterized as reflecting the

Firm's commitment to attracting ████████████████████████████████████████

███████████████████████.

17.     Since she began her employment with Proskauer, Plaintiff has been the co-head and

then head of Proskauer's D.C. ████████████████ practice, co-head of Proskauer's

████████████████ Group, and co-head and then head of Proskauer's ██████████

█████████████ Group.  Plaintiff is also editor of the Firm's ████████████████

███████████ blog and co-editor of the Firm's ████████████ blog.

18.     At Proskauer, Plaintiff has been a stand-out performer.  From 2014 to 2016,

Plaintiff ranked *6th* among the Firm's over 180 equity partners for her billable hours and ranked

*18th* for her robust client originations.  In addition, Plaintiff has made important contributions to

the Firm generally and its Washington, D.C. office in particular, including transforming the D.C. ███████████████ practice and managing one of the most productive and profitable office practice groups. She is the ██████████ for the D.C. office, serves on the firm-wide Marketing Committee, and, when Proskauer relocated its Washington, D.C. office, served on both the design and art selection committees. *Yet, when it comes to her compensation, Plaintiff ranks only **32nd** among equity partners.*

19.     Plaintiff has earned substantial recognition outside the Firm. Legal publications have recognized her as a leader in the profession, including *Chambers USA* (for ████████ ████████ in the District of Columbia in 2012, 2014-2016), *The Legal 500 United States* (for ████████████████████████████ in 2014-2016), *Washington, DC Super Lawyers* (2008-2017), *Washington Business Journal* (2004 and 2009), and *Washingtonian Magazine* (as a top Washington Lawyer for ████████ in 2004, 2007, 2009, 2011, 2013, and 2015).  In the *Legal Times*'s most recent "Leading Lawyers" series, Plaintiff was voted by her peers as "The Top ████████████ Attorney" in the District of Columbia.  She is rated AV Preeminent by Martindale-Hubbell.  Plaintiff is also a nationally-recognized speaker who has spoken at numerous national conventions and seminars, including conventions hosted by the American Bar Association and the Industry Liaison Group.

20.     Before she raised complaints of discrimination and retaliation at the Firm, Plaintiff's strong contributions were repeatedly acknowledged by Proskauer's leadership, including Proskauer's Chairman Joseph M. Leccese.  For example, Chairman Leccese commented that Plaintiff was the most successful lateral transition in the history of Proskauer.  Chairman Leccese also told Plaintiff that she was an "amazing partner," that she had "the perfect practice," and that he wished she had "a hundred [Janes]."  He remarked that Proskauer's profits would soar

if all the partners were as productive and marketing-oriented as Plaintiff.

## B. *Proskauer's Anti-Discrimination and Anti-Retaliation Obligations*

21.     Proskauer is subject to the New York Rules of Professional Conduct and the D.C. Rules of Professional Conduct, in addition to disciplinary rules in the other jurisdictions where Proskauer maintains offices or otherwise represents clients.

22.     The New York Rules of Professional Conduct prohibit discrimination in the practice of law on the basis of sex. The D.C. Rules of Professional Conduct prohibit discrimination in conditions of employment on the basis of sex and family responsibility. All Proskauer partners are entitled to protection from gender discrimination under the New York Rules of Professional Conduct. Proskauer partners in Washington, D.C. are also entitled to protection from gender and family responsibility discrimination under the D.C. Rules of Professional Conduct.

23.     According to Proskauer's Equal Employment Opportunity and Anti-Harassment Policy: "Each individual has the right to work in a professional atmosphere that promotes equal employment opportunities and prohibits discriminatory practices, including harassment."

24.     Proskauer's Equal Employment Opportunity and Anti-Harassment Policy further provides that "Proskauer prohibits retaliation against any individual who reports discrimination or harassment or participates in an investigation of such reports. Retaliation against an individual for reporting harassment or discrimination or for participating in an investigation of a claim of harassment or discrimination is a serious violation of this policy and, like harassment or discrimination itself, will be subject to disciplinary action."

25.     The protections set forth in Proskauer's Equal Employment Opportunity and Anti-Harassment Policy apply to the Firm's partners.

26.     Proskauer's partners have a right to work in a professional atmosphere free of discrimination and retaliation.

27.     It is an implicit term of Proskauer's Partnership Agreement that Proskauer partners, including Proskauer's Chairman and Executive Committee, will adhere to their basic ethical obligations under all applicable Rules of Professional Conduct.   Refraining from gender discrimination in the practice of law and in the terms of employment are fundamental ethical duties in New York and the District of Columbia, respectively.

28.     Female partners would not join the Firm if they believed that Proskauer and its Executive Committee claimed the unfettered right to discriminate against them based on their gender or family responsibilities, or to retaliate against them for raising concerns about discrimination.

29.     Plaintiff would not have joined the Proskauer partnership absent an understanding that she would be compensated fairly in relation to her male partners, would not be discriminated against based on her gender and family responsibilities, and would not be retaliated against for seeking to address any discrimination or harassment that she or others might encounter.

30.     Proskauer and its Executive Committee have legal, ethical, contractual, and fiduciary duties not to discriminate or retaliate against Firm partners, including based on gender.

C.     *Proskauer's Unlawful Acts and Omissions*

31.     When Plaintiff joined Proskauer in ███, the Firm set her total compensation at an annualized rate of $██ million per year (inclusive of signing bonus), prorated because she joined the Firm mid-year.  When she tried to negotiate for higher compensation, Allan Fagin, the Firm's former Chairman, repeatedly assured Plaintiff that she would quickly move up to an annual compensation level of more than $3 million per year if she generated revenue at a level of $7

million per year or more.  Plaintiff was told that future pay increases would be based primarily on the business she originated for the Firm.

32.     In ████, her first full year at the Firm, Plaintiff excelled, but Proskauer did not increase her compensation to a level commensurate with her strong performance.  Plaintiff originated approximately $7.4 million in client revenue that year, billed over 2,600 hours, and worked over 3,100 hours in total.  Yet the Firm increased her compensation by only 2% – to $████ million per year – and paid her substantially less than many similarly situated male partners.  For example, the Firm paid a male partner who had joined Proskauer less than a year before Plaintiff compensation of $6 million (more than two-and-a-half times Plaintiff's compensation), even though his client originations and hours were substantially lower than Plaintiff's.

33.     After she was notified of her allocation in early December 2014, Plaintiff expressed concerns about her compensation level to the D.C. office head, to an Executive Committee member, and to others, but Proskauer would not address the inequities in Plaintiff's compensation. However, Plaintiff was assured once again that she was a "star" and should anticipate substantial increases in the future.

34.     In 2015, Plaintiff's performance was even stronger.  She originated over $9.2 million in client revenue, billed nearly 2,600 hours, and worked nearly 2,900 hours in total.  By this point, Plaintiff had helped transform the D.C. ██████████████ practice, driving substantial revenue, and supervising one of the most productive teams in the entire practice group.

35.     At a meeting with her ██████████████████████████ in late 2015 to discuss upcoming allocation decisions for 2015, Plaintiff objected that she was not being paid equitably in relation to her male peers.  She expressed an expectation that she be paid at least $2.75 million –

a conservative request considering Plaintiff's performance and contributions to the Firm and the compensation received by male peers.

36.  ████████████████, however, responded to Plaintiff's complaint by interrogating Plaintiff on why she thought she deserved more compensation. He demanded, "*What makes you think that you should be paid more than me*?"

37.  Plaintiff left the conversation with ██████████████ feeling demoralized and attacked, and she immediately complained to D.C. office head Paul Hamburger, to an Executive Committee member, and to others regarding ████████████████'s comments to and treatment of her.  On information and belief, Proskauer did not investigate her concerns or impose any discipline on ██████████████.

38.  Following her complaints about inequitable treatment in late 2015, the Firm's treatment of Plaintiff grew increasingly hostile.  In March 2016, when Plaintiff suffered a family emergency and had to step down as first chair from an upcoming trial, rather than respond with sympathy and support, ██████████████ berated Plaintiff, baselessly claiming, among other things, that she had concealed her family situation from the Firm.

39.  Taking the lead from ████████████████, the two male litigators who took over the trial were overtly hostile to Plaintiff, frequently disregarding her advice and offers of assistance, demeaning and belittling her, disparaging her to her peers and clients, and at times yelling at her.  When the case proceeded to trial in April 2016, Plaintiff did everything she could from the D.C. office to assist.  However, the male litigators repeatedly refused to coordinate or strategize with Plaintiff regarding the trial.

40.  On one occasion shortly after the trial, ████████████████ ██████████ pressured Plaintiff to sign an opinion letter regarding a potential settlement.  Plaintiff

objected that it would be unethical for her to do so under the circumstances and refused to sign it. In response, ███████████████ yelled at Plaintiff and baselessly accused her of "lying" about client communications that he knew nothing about.

41.     The Firm's hostile treatment took a psychological and physiological toll on Plaintiff.  She experienced symptoms of emotional distress that included hypertension, extreme anxiety, a heart-valve condition, esophagitis, and insomnia.  Plaintiff had to seek treatment, take medication, and take repeated medical leave as a consequence of Defendant's mistreatment.

42.     As a result of Defendant's mistreatment, Plaintiff's blood pressure soared so high that she was rushed by ambulance to the hospital, where she was diagnosed with severe hypertension, a heart value condition, and esophagitis.  All of these medical conditions were tied to the extreme stress she was experiencing at work.  Plaintiff's doctor described her as a "walking heart attack."  Shortly thereafter, at the recommendation of her internist, Plaintiff met for the first time in her life with a psychiatrist, who directed her to enter psychotherapy and prescribed medication to control her severe anxiety.

43.     By September 2016, it was clear that Plaintiff was being marginalized at the Firm. Despite her expertise and track record, she was rarely asked to work on the Firm's client matters. For example, even though she had extensive experience in matters involving the ████████████ ██████████████████, and even though she chairs this practice area at the Firm, Proskauer began diverting those matters away from her to a male junior associate and a male junior partner with little or no relevant expertise.

44.     In addition, since Plaintiff complained, Proskauer has not asked Plaintiff to pitch or to participate in a single ██████████ litigation matter for Firm or prospective Firm clients. By contrast, during this same period, Proskauer was referring numerous ██████████ litigation cases

to male partners in the New York, Los Angeles, and Chicago offices, including a newly hired male equity partner. Sitting through monthly office head meetings, Plaintiff has heard about Proskauer referring case after case, including clients and cases in the D.C. area, to male partners.

45.     Plaintiff – recognizing that the Firm was attempting to marginalize her – expressed interest in taking on a greater role at the Firm, but Proskauer rebuffed her efforts.

46.     In a one-on-one meeting held in late September 2016 with Chairman Leccese, Plaintiff offered to take a greater leadership role in the Firm's Washington, D.C. office (something that had been discussed when she initially joined the Firm) and in the ███████████████ Department. Plaintiff also shared various ideas for new marketing niches and offered to become more involved in lateral recruiting (which had been a big focus of Plaintiff's at her prior firms and was desperately needed for the Firm's dwindling D.C. office). Every proposal she made, however, was soundly rejected by Chairman Leccese. Indeed, Chairman Leccese repeatedly told Plaintiff that the practices she described were being developed or handled by other (generally male) partners.

47.     Later that same night, at a cocktail reception and dinner held by the Firm, Plaintiff was treated as *persona non grata.* Chairman Leccese pointedly refused to sit next to Plaintiff and sat with his back to her the entire night.

48.     The hostile treatment continued when Plaintiff came to New York in October 2016 for a series of meetings to discuss her 2016 compensation allocation. When Plaintiff greeted ████████████████████ at a Partners' luncheon, he turned his shoulder and pushed his right elbow at her chest, blocking Plaintiff from approaching him in front of other partners. This public shunning left Plaintiff feeling shaken, embarrassed, and isolated.

49.     Later that same day, at an in-person meeting with an Executive Committee member, Plaintiff was informed that there was a faction of partners, headed by ███████████████, looking for something to use against Plaintiff in the compensation process.  This became clear to Plaintiff later that day when she met with ████████████████████████.

50.     At that meeting, ████████████████████████ subjected Plaintiff to extreme and unwarranted scrutiny.  While discussing the draft year-end self-evaluation that Plaintiff had prepared, ██████████████'s tone and demeanor were hostile; he subjected Plaintiff to cross examination on an array of details in the draft and peppered her with criticisms that were baseless.

51.     Following these incidents, Plaintiff's blood pressure again became dangerously high and she had to increase her daily hypertension medications.  Her anxiety about her career and the unlawful treatment she was experiencing at work became so severe that for the first time she began taking anti-anxiety medication during the day, at the recommendation of her psychiatrist.

52.     After suffering this hostile treatment and experiencing such emotional and physical distress, Plaintiff had little choice but to escalate her complaints.

53.     On November 8, 2016, Plaintiff sent a lengthy email to Chairman Leccese and the Firm's General Counsel, Stephen Obus, objecting to the discriminatory and retaliatory treatment she had experienced at Proskauer.  In that email, Plaintiff expressed her concerns about gender pay inequality, explaining that she was stunned by how her compensation compared to male peers who had significantly less client originations and billable hours than she did.  She described the hostile treatment she was receiving from ████████████████████████ and expressed concern that her compensation would continue to be suppressed due to ongoing discrimination and retaliation.

54.     In her email to Chairman Leccese, Plaintiff stressed: "I deserve (1) not to be subjected to hostile and unprofessional treatment; (2) not to be discriminated or retaliated against; and (3) to be compensated equitably compared to my peers."  Plaintiff also explained to Chairman Leccese how she made the difficult decision to step forward to advocate for more equitable treatment.  Taking inspiration from her teenage daughter, Plaintiff wrote: "I have to stand up for her to make certain that she -- after 27 years of practicing medicine, or law, or whatever profession she chooses -- and girls like her do not face the dilemma that I now face: do I remain quiet and allow male partners about whom I have complained destroy my career or do I, despite the possible consequences, take[] steps to ensure that I am treated fairly and not exposed to an increasingly hostile situation?  I am determined to take the second path and let the chips fall where they may.  I hope it does not come to that."

55.     On November 16, 2016, Plaintiff was interviewed by General Counsel Obus and long-time employment partner Betsy Plevan.  When asked by Ms. Plevan why she believed there was a gender problem, Plaintiff explained that she had been subjected to many gender-related comments, including comments relating to her appearance and family situation; observed that male partners have not suffered the same overt abuse; and noted that as a pay equity expert, she could see the discrimination in the numbers, drawing distinctions between the treatment of other male partners and herself.

56.     Ultimately, despite Plaintiff's complaint, in 2016 the Firm again failed to increase her compensation to a level commensurate with her strong performance.  That year, Plaintiff had generated over $8.4 million in revenue on clients she originated, billed nearly 2,300 hours, and worked over 2,600 hours in total, despite the fact that she was suffering from emotional and physical damage as a consequence of the Firm's mistreatment.  Once again, the Firm failed to

increase her compensation to the level she had been ██████████████████████████

████████████████████████

██   ████████████████████████████████████████   would not result in

adequate redress, and she made the decision to take legal action.  On February 14, 2017, Plaintiff

– through her attorneys – communicated to General Counsel Obus, advising Proskauer that she

had retained counsel to pursue claims of discrimination and retaliation against the Firm.

58.     Shortly after learning that Plaintiff had retained employment counsel, the Firm

threatened to terminate her as a result of her complaining about gender discrimination.

**COUNT I**
**VIOLATION OF THE FAIR LABOR STANDARDS ACT OF 1938, AS**
**AMENDED BY THE EQUAL PAY ACT OF 1963,**
**29 U.S.C. § 206(d); 29 U.S.C. § 216(b)**

59.     Plaintiff re-alleges and incorporates each and every allegation of this Complaint.

60.     Proskauer is Plaintiff's "employer," and Plaintiff is an "employee" of Proskauer,

within the meaning of the Fair Labor Standards Act of 1938, 29 U.S.C. § 206, *et seq*., as amended

by the Equal Pay Act of 1963 ("Equal Pay Act").

61.     Proskauer has discriminated against Plaintiff in violation of the Equal Pay Act by

paying her less than similarly situated male employees who performed jobs which required equal

skill, effort, and responsibility, and which were performed under similar working conditions.

62.     The differential in pay between Plaintiff and similarly situated male partners was

not due to seniority, merit, quantity or quality of production, or a factor other than sex, but was

due to sex.

63.     Proskauer caused, attempted to cause, contributed to, or caused the continuation of

wage rate discrimination based on sex in violation of the Equal Pay Act.

64.     Proskauer willfully paid Plaintiff less than similarly situated male employees.  The foregoing conduct constitutes a willful violation of the Equal Pay Act within the meaning of 29 U.S.C. § 255(a).  Because Defendant has willfully violated the Equal Pay Act, a three-year statute of limitations applies to such violations pursuant to 29 U.S.C. § 255(a).

65.     As a result of Defendant's unlawful conduct, Plaintiff has suffered and will continue to suffer harm, including, but not limited to, lost earnings, lost benefits, and other financial losses, as well as non-economic damages, including emotional and physical distress, humiliation, embarrassment, and mental anguish.

66.     Plaintiff is entitled to all legal and equitable remedies available for violations of the Equal Pay Act, including, but not limited to, back pay, liquidated damages, pre-judgment and post-judgment interest, reasonable attorneys' fees and litigation costs, and other compensation pursuant to 29 U.S.C. § 216(b).

**COUNT II**
**VIOLATION OF THE FAIR LABOR STANDARDS ACT OF 1938,**
**AS AMENDED BY THE EQUAL PAY ACT OF 1963,**
**29 U.S.C. § 215(a)(3); 29 U.S.C. § 216(b)**
**RETALIATION**

67.     Plaintiff re-alleges and incorporates each and every allegation contained in this Complaint.

68.     Plaintiff engaged in protected activity under the Equal Pay Act, including complaining to Proskauer about gender discrimination in compensation and informing Proskauer that she had retained counsel to bring claims of gender discrimination in compensation.

69.     Defendant engaged in adverse employment actions against Plaintiff for engaging in protected activity.  Among other things, Proskauer excluded Plaintiff from client matters, declined to allow Plaintiff to pitch or to participate in any employment litigation matter for Firm

clients, rebuffed her efforts to assume a greater leadership role at the Firm, tolerated and facilitated an environment where she was targeted for harassment and humiliation by Firm leadership, demeaned and belittled her to her peers and clients, and refused to rectify pay disparities.  Recently, Proskauer has threatened to terminate Plaintiff.

70.     As a result of Defendant's unlawful conduct, Plaintiff has suffered and will continue to suffer harm, including, but not limited to, lost earnings, lost benefits, and other financial losses, as well as non-economic damages, including emotional and physical distress, humiliation, embarrassment, and mental anguish.

71.     Plaintiff is entitled to all legal and equitable remedies available for violations of the Equal Pay Act, including, but not limited to, back pay, liquidated damages, pre-judgment and post-judgment interest, reasonable attorneys' fees and litigation costs, and other compensation pursuant to 29 U.S.C. § 216(b).

## <u>COUNT III</u>
### VIOLATION OF THE FEDERAL FAMILY AND MEDICAL LEAVE ACT OF 1993
### 29 U.S.C. § 2601, *et seq.*

72.     Plaintiff re-alleges and incorporates by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

73.     The federal Family and Medical Leave Act of 1993 entitles employees to take leave because the employee is suffering from a serious health condition or in order to care for a child who is suffering from a serious health condition.

74.     Plaintiff took FMLA-qualifying leave related to her own serious health conditions and relating to the care of her child who was suffering from a serious health condition.

75.     Defendant interfered with Plaintiff's ability to take FMLA-protected leave and then discriminated and retaliated against her for taking FMLA-protected leave.  Among other things,

Defendant disrupted her client relationships, demeaned her to her peers, impermissibly considered her FMLA-qualifying leave when rendering compensation decisions, and created an environment hostile to the taking of statutorily protected leave. Further, Defendant recently threatened to terminate Plaintiff in retaliation for asserting her claims, which include FMLA claims.

76.     Defendant's conduct was not in good faith and was in intentional violation of Plaintiff's FMLA rights.

77.     As a result of Defendant's unlawful conduct, Plaintiff has suffered and will continue to suffer harm, including but not limited to lost earnings, lost benefits, and other financial losses, as well as non-economic damages.

78.     Because of Defendant's unlawful conduct, Plaintiff is entitled to all legal and equitable remedies available for violations of the FMLA, including an award of back pay, front pay, liquidated damages, and attorneys' fees and costs.

**COUNT IV**
**VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT**
**D.C. Code § 2-1401, *et seq.* AS AMENDED**
**PAY DISCRIMINATION**

79.     Plaintiff re-alleges and incorporates each and every allegation of this Complaint.

80.     Defendant, an employer within the meaning of the DCHRA, has discriminated against Plaintiff by treating her differently from, and less preferably than, similarly situated males by subjecting her to pay discrimination in violation of the DCHRA.

81.     Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of the Plaintiff entitling her to punitive damages.

82.     As a result of Defendant's conduct alleged in this Complaint, the Plaintiff has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits, and other financial loss, including interest.

83.     Because of Defendant's discrimination, the Plaintiff is entitled to all legal and equitable remedies available for violations of the DCHRA, including an award of punitive damages.

84.     Attorneys' fees should be awarded under D.C. Code § 2-1403.13(e).

**<u>COUNT V</u>**
**VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT**
**D.C. Code §§ 2-1401, _et seq._ AS AMENDED**
**RETALIATION**

85.     Plaintiff re-alleges and incorporates each and every allegation of this Complaint.

86.     Defendant, an employer within the meaning of the DCHRA, has discriminated against Plaintiff by retaliating against her for complaining about and opposing her discriminatory treatment, including pay discrimination, in violation of the DCHRA.

87.     Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of the Plaintiff, entitling her to punitive damages.

88.     As a result of Defendant's conduct alleged in this Complaint, the Plaintiff has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits and other financial loss, including interest.

89.     Because of Defendant's discrimination and retaliation, the Plaintiff is entitled to all legal and equitable remedies available for violations of the DCHRA, including an award of punitive damages.

90.     Attorneys' fees should be awarded under D.C. Code §2-1403.13(e).

## COUNT VI
## VIOLATION OF THE DISTRICT OF COLUMBIA
## FAMILY AND MEDICAL LEAVE ACT
### D.C. Code § 32-507

91.     Plaintiff re-alleges and incorporates by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

92.     The D.C. Family and Medical Leave Act ("DCFMLA") entitles employees to take leave because the employee is suffering from a serious health condition or in order to care for a child who is suffering from a serious health condition.

93.     Plaintiff took DCFMLA-qualifying leave related to her own serious health conditions and relating to the care of her child who was suffering from a serious health condition.

94.     Defendant interfered with Plaintiff's ability to take DCFMLA-protected leave and then discriminated and retaliated against her for taking DCFMLA-protected leave.  Among other things, Defendant disrupted her client relationships, demeaned her to her peers and clients, impermissibly considered her FMLA-qualifying leave when rendering compensation decisions, and created an environment hostile to the taking of statutorily protected leave.  Further, Defendant recently threatened to terminate Plaintiff in retaliation for asserting her claims, which include DCFMLA claims.

95.     Defendant's conduct was not in good faith and was in intentional violation of Plaintiff's DCFMLA rights.

96.     As a result of Defendant's unlawful conduct, Plaintiff has suffered and will continue to suffer harm, including but not limited to lost earnings, lost benefits, and other financial losses, as well as non-economic damages.

97.     Because of Defendant's unlawful conduct, Plaintiff is entitled to all legal and equitable remedies available under D.C. Code § 32-509, including actual damages, statutory liquidated damages, and attorney's fees and costs.

## COUNT VII
## VIOLATION OF THE MARYLAND EQUAL PAY FOR EQUAL WORK LAW
### Md. Labor & Employment Code §§ 3-301 *et seq.*

98.     Plaintiff re-alleges and incorporates each and every allegation of this Complaint.

99.     Defendant Proskauer is an employer within the meaning of Md. Labor & Employment Code § 3-301 and employed Plaintiff in Maryland within the meaning of Md. Labor & Employment Code § 3-101.  Plaintiff is admitted to practice law in Maryland.

100.    Proskauer has discriminated against Plaintiff within the meaning of the Maryland Equal Pay law, Md. Labor & Employment Code § 3-304, by providing her with lower pay than similarly situated male colleagues on the basis of her gender. Plaintiff performed similar duties of the same character and type as her male counterparts.

101.     Plaintiff and similarly situated male partners all performed jobs that required equal skill, effort, and responsibility.

102.    Defendant discriminated against Plaintiff by subjecting her to discriminatory pay in violation of the Equal Pay law.

103.    The differential in pay between Plaintiff and similarly situated male partners was not due to seniority, merit, quantity or quality of production, or a legitimate factor other than sex, but was due to gender.

104.    Further, Defendant discriminated against Plaintiff in violation of the Maryland Equal Pay law by providing less favorable employment opportunities to her based on her sex, within the meaning of Md. Labor & Employment Code § 3-304(a), (b)(1)(ii).

105.     Defendant caused, attempted to cause, contributed to or caused the continuation of pay discrimination and other discrimination based on gender, in violation of the Maryland Equal Pay law.

106.     Defendant knew or reasonably should have known that its conduct violated Md. Labor & Employment Code § 3-304.

107.     As a result of Defendant's conduct as alleged in this Complaint, Plaintiff has suffered and continues to suffer harm, including but not limited to: lost earnings, lost benefits and other financial loss, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

108.     Because of Defendant's discrimination, Plaintiff is entitled to all legal and equitable remedies available for violations of the Equal Pay law, including liquidated damages, interest, and other compensation pursuant to Md. Labor & Employment Code § 3-307.

109.     Attorneys' fees should be awarded under Md. Labor & Employment Code § 3-307.

<u>**COUNT VIII**</u>
**VIOLATION OF THE MARYLAND EQUAL PAY FOR EQUAL WORK LAW**
**Md. Labor & Employment Code §§ 3-301** *et seq.*
**RETALIATION**

110.     Plaintiff re-alleges and incorporates each and every allegation of this Complaint.

111.     Defendant Proskauer is an employer within the meaning of Md. Labor & Employment Code § 3-301 and employed Plaintiff within Maryland within the meaning of Md. Labor & Employment Code § 3-101.

112.     Plaintiff engaged in protected activity under the Equal Pay law by complaining to Proskauer about gender discrimination in compensation, including by inquiring about and discussing the reasons for her own wages and the wages of male comparators.

113.    Because of these complaints, Proskauer discriminated against Plaintiff by reassigning and excluding her from client matters in violation of Md. Labor & Employment Code § 3-304.1(a). Proskauer declined to invite Plaintiff to pitch or to participate in any employment litigation matter for the Firm, instead referring numerous employment litigation cases to male partners, also in violation of § 3-304.1(a). Proskauer further discriminated against Plaintiff by facilitating and tolerating an environment where she was targeted for harassment and humiliation by Firm leadership.

114.    Furthermore, Proskauer has recently threatened to terminate Plaintiff in violation of § 3-304.1(a).

115.    Defendant knew or reasonably should have known that its conduct violated Md. Labor & Employment Code § 3-304.1.

116.    Under Md. Labor & Employment Code § 3-307, Plaintiff is entitled to back pay, liquidated damages, and other relief.

117.    Attorneys' fees should be awarded under § 3-307.

**COUNT IX**
**BREACH OF FIDUCIARY DUTY**

118.    Plaintiff re-alleges and incorporates each and every allegation of this Complaint.

119.    Proskauer owes a fiduciary duty to Plaintiff based on her status as a member of the Firm's partnership.

120.    Proskauer has a duty to deal fairly, honestly, and openly with Plaintiff.  Without limiting the generality of the foregoing, Proskauer has a duty not to discriminate or retaliate against Plaintiff.

121.    Proskauer has breached its fiduciary duty to Plaintiff by failing treat her equitably and instead discriminating and retaliating against Plaintiff.  Without limiting the generality of the

foregoing, Proskauer has violated its duty to Plaintiff by impermissibly discriminating against her based on her gender, caregiver status, and taking of qualifying leaves and by baldly threatening to fire her in retaliation for asserting her good faith claims of discrimination and retaliation.

122.    Plaintiff suffered substantial damages as a result of the Proskauer's breach of its fiduciary duties.

## COUNT X
## BREACH OF CONTRACT/BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

123.    Plaintiff re-alleges and incorporates each and every allegation of this Complaint.

124.    Every contractual arrangement inherently carries with it a covenant of good faith and fair dealing.

125.    Encompassed within Defendant's obligation to act in good faith were any promises which a reasonable person in Plaintiff's shoes would be justified in understanding were included. The covenant embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. Even where a contract contemplates the exercise of discretion by one party, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion.  Rather, the party must exercise its discretion reasonably and in good faith.

126.    Under the Firm's Partnership Agreement, Proskauer's Executive Committee determines the allocation of profits to the Firm's partners.  It is an implied term of the Proskauer Partnership Agreement that the Executive Committee will not make profit allocation decisions in a manner that is discriminatory or retaliatory.

127.   Further, it is an implicit and material part of the Partnership Agreement that Proskauer and its Executive Committee will not otherwise discriminate or retaliate against partners, including on the basis of gender.

128.   Defendant breached the covenant of good faith and fair dealing by arbitrarily discriminating and retaliating against Plaintiff, falsely promising to increase her compensation, demeaning and belittling her to her peers, and maliciously interfering with her client relationships. Further, Defendant has threatened to terminate Plaintiff for asserting good faith discrimination and retaliation claims.

129.   Plaintiff has been damaged by Proskauer's breach of its contractual obligations, including the covenant of good faith and fair dealing, in an amount to be determined at trial.

## COUNT XI
## FRAUDULENT MISREPRESENTATION

130.   Plaintiff re-alleges and incorporates each and every allegation of this Complaint.

131.   Proskauer repeatedly made false statements to Plaintiff that it would raise her compensation to specific levels if she continued to demonstrate similar performance and results.

132.   At the time Proskauer made these statements, Proskauer knew it had no intention to honor them but merely wished to induce Plaintiff to join the Firm and then to placate Plaintiff and string her along.

133.   Proskauer intended to deceive Plaintiff into continuing to work for the Firm at her present compensation, while generating millions of dollars in revenues.

134.   Plaintiff justifiably relied on Proskauer's false representations that increased compensation was coming to her.   She remained at Proskauer and continued to work extraordinarily long hours and bring in large revenues for the Firm.

135.     Plaintiff has been damaged by her reliance on Proskauer's representations.  She has never been paid the compensation that she was promised when she joined the Firm.  As a result, she is entitled to damages to be determined at trial.

**COUNT XII**
**UNJUST ENRICHMENT**

136.     Plaintiff re-alleges and incorporates each and every allegation of this Complaint.

137.     Under the common law doctrine of unjust enrichment, Proskauer, by its policies and actions, benefited from, and increased its profits by failing to pay Plaintiff all compensation due to her as a Partner.

138.     Proskauer accepted and received the benefits of the work performed by Plaintiff, the business and revenues she generated for the Firm, and her annual capital contributions and was unjustly enriched.  It is inequitable and unjust for Proskauer to reap the benefits of Plaintiff's work and financial contribution without proper remuneration.

139.     Plaintiff is entitled to relief for this unjust enrichment in an amount equal to the benefits and contribution unjustly retained by Proskauer, plus interest on these amounts.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests the following relief:

A.     Award Plaintiff all back pay, front pay, lost benefits, liquidated damages, compensatory damages, punitive damages, and other damages available under law;

B.     Award Plaintiff all pre-judgment interest and post-judgment interest available under law;

C.     Award Plaintiff all of her litigation costs and expenses, including reasonable attorneys' fees;

D.     Enter judgment in favor of Plaintiff in excess of $50 million; and

E.      Award other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY

The Plaintiff demands trial by jury of all issues triable of right to a jury.


Dated: May 12, 2017                              **SANFORD HEISLER SHARP, LLP**


By:     _____
        David Sanford, D.C. Bar No. 457933
        Vince McKnight, D.C. Bar No. 293811
        Altomease Kennedy, D.C. Bar No. 229237
        Kate Mueting, D.C. Bar No. 988177
        **SANFORD HEISLER SHARP, LLP**
        1666 Connecticut Avenue NW, Suite 300
        Washington, DC 20009
        Telephone: (202) 499-5201
        Facsimile: (202) 499-5199
        dsanford@sanfordheisler.com

        Andrew Melzer* (AM-7649)
        Alexandra Harwin, D.C. Bar No. 1003018
        **SANFORD HEISLER SHARP, LLP**
        1350 Avenue of the Americas, 31st Floor
        New York, New York 10019
        Telephone: (646) 402-5655
        Facsimile: (646) 402-5651
        jheisler@sanfordheisler.com
        aharwin@sanfordheisler.com

        Kevin Sharp, TN Bar No. 016287
        **SANFORD HEISLER SHARP, LLP**
        611 Commerce Street, Suite 3100
        Nashville, TN 37203
        Telephone: (615) 434-7000
        Facsimile: (615) 434-7020
        ksharp@sanfordheisler.com

        *pro hac vice* application forthcoming