# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

```
----------------------------------------------------------- x
JANE DOE,                                    :
                                             :
                    Plaintiff,               :
                                             :          Civil Action No. 17-00901 (ABJ)
              v.                             :
                                             :          **ORAL ARGUMENT REQUESTED**
PROSKAUER ROSE LLP,                          :
                                             :
                    Defendant.               :
----------------------------------------------------------- x
```

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
## AND MOTION TO DISMISS

Defendant Proskauer Rose LLP ("Proskauer"), through its undersigned counsel, hereby respectfully moves this Court for an order pursuant to Rule 56 of the Federal Rules of Civil Procedure for Summary Judgment as to Counts I-VIII of Plaintiff's Complaint.  This Motion for Summary Judgment is supported by the attached Statement of Points and Authorities, any reply thereto, the attached Statement of Material Facts As to Which There is No Genuine Dispute, the Declaration of Joseph M. Leccese, Esq. In Support of Motion for Summary Judgment and the exhibits thereto, all of the other pleadings and papers on file in this action, and such matters as may be presented at any hearing on this Motion for Summary Judgment.

Proskauer also hereby respectfully moves this Court for an order pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure dismissing with prejudice Counts VII and VIII of Plaintiff's Complaint, and Rule 12(b)(6) of the Federal Rules of Civil Procedure dismissing with prejudice Counts VII-XII of Plaintiff's Complaint.  This Motion to Dismiss is supported by the attached Statement of Points and Authorities, any reply thereto, all of the pleadings on file in this action, and such matters as may be presented at any hearing on this Motion to Dismiss.

A Proposed Order granting the relief requested herein is attached hereto pursuant to

LCvR 7(c).

Dated:  June 13, 2017                    Respectfully submitted,

                                         PROSKAUER ROSE LLP

                                         /s/ Colin Kass
                                         Colin Kass (DC Bar No. 460630)
                                         1001 Pennsylvania Avenue, N.W.
                                         Suite 600 South
                                         Washington, D.C. 20004
                                         Telephone:  (202) 416-6890
                                         Facsimile:  (202) 416-6899
                                         Email:  ckass@proskauer.com

                                         Kathleen M. McKenna* (KM-4258)
                                         Steven E. Obus* (SO-9791)
                                         Evandro C. Gigante* (EG-7402)
                                         Eleven Times Square
                                         New York, New York 10036

                                         *Counsel for Defendant*
                                         Proskauer Rose LLP

                                         **pro hac vice* application pending*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

------------------------------------------------------------ x

JANE DOE,                                                  :

             Plaintiff,           :

                              :        Civil Action No. 17-00901 (ABJ)

        v.                                                :

PROSKAUER ROSE LLP,                                        :

             Defendant.          :

------------------------------------------------------------ x

**DEFENDANT'S STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT AND  MOTION TO DISMISS**

# TABLE OF CONTENTS

Page(s)

PRELIMINARY STATEMENT ...................................................................................................1

SUMMARY OF LEGAL ARGUMENT ......................................................................................2

STATEMENT OF MATERIAL UNDISPUTED FACTS ............................................................4

      A.    The Firm's Partnership Agreement........................................................................5

      B.    Equity Partner Voting on Firm Affairs .................................................................5

      C.    The Firm's Executive Committee..........................................................................6

      D.    Allocation of Profits and Losses Among Equity Partners;
            Capital Contributions............................................................................................9

      E.    Partner Allocations................................................................................................9

      F.    The Firm's Partners Operate as Business Owners...............................................13

      G.    Doe's Tenure with the Firm ................................................................................14

ARGUMENT...............................................................................................................................16

I.      AS AN OWNER OF THE FIRM, PLAINTIFF IS NOT COVERED BY THE
       EMPLOYMENT STATUTES UNDER WHICH SHE SEEKS TO RECOVER..................16

      A.    Applicable Standards ..........................................................................................17

      B.    The Six *Clackamas* Factors Demonstrate That Plaintiff Is An Owner......................20

            1.    The Firm Did Not "Hire" Plaintiff, Cannot "Fire" Her, and
                 Does Not Set Rules and Regulations Giving It Control
                 Over Her Work ........................................................................................21

            2.    None of Plaintiff's Co-Owners Supervises Her Work....................................23

            3.    Plaintiff Does Not Report to Any of Her Co-Owners....................................25

            4.    Plaintiff Has the Ability to Influence the Firm, Including by Voting on
                 Firm Affairs, Serving on the Executive Committee or as Firm Chair, or
                 Electing Her Co-Owners to Serve on Her Behalf.........................................26

5.      The Firm's Partnership Agreement Evidences an Intent that Plaintiff
        Be an Owner/Employer, Not an Employee....................................................28

6.      As an Owner of the Firm, Plaintiff Shares in the Firm's Profits, Losses
        And Liabilities ...............................................................................................29

II.     PLAINTIFF IS NOT COVERED BY THE MARYLAND EQUAL PAY FOR
        EQUAL WORK ACT....................................................................................................31

III.    DOE'S COMMON LAW CLAIMS SHOULD BE DISMISSED.........................................33

        A.      Doe's Common Law Claims Are Governed By New York Law ..............................34

        B.      Doe Fails to State A Breach of Contract Claim.....................................................35

        C.      Doe Fails to State a Claim for Breach of Fiduciary Duty.........................................37

                1.      The Fiduciary Duty Claim is Duplicative of the Contract Claim.................37

                2.      Doe's Breach of Fiduciary Duty Claim Fails Because the Firm
                        Performed in Accordance with the Partnership Agreement.........................38

                3       A Breach of Fiduciary Duty Claim Cannot Arise From Alleged
                        Violation of An Ethical Rule .......................................................................39

        D.      Doe's Unjust Enrichment Claim Fails Because Her Rights Are Governed by
                An Express Contract ...............................................................................................41

        E.      Doe Fails to State A Claim for Fraudulent Misrepresentation ...............................42

                1.      Doe's Allegations Are Insufficient to Support a Claim of Fraud.................42

                2.      Doe's Claim is a Breach of Contract Claim "Masquerading" As a
                        Fraud Claim ...............................................................................................44

CONCLUSION..........................................................................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Albert Apartment Corp. v. Corbo Co.*,
    182 A.D.2d 500 (1st Dep't 1992) ...................................................................43

*Albert v. DRS Techs., Inc.*,
    10-cv-03886, 2011 WL 2036965 (D.N.J. May 23, 2011)...........................................32

*Anderson v. Liberty Lobby*,
    477 U.S. 242 (1986)..................................................................................17

*Arnold v. Cargill, Inc.*,
    No. 01-cv-2086, 2002 WL 1576141 (D. Minn. July 15, 2002) ................................33

* *Atlantis Info. Tech. v. CA, Inc.*,
    485 F. Supp. 2d 224 (E.D.N.Y. 2007) ....................................................37, 38, 41

*Baker v. Gurfein*,
    744 F. Supp. 2d 311 (D.D.C. 2010) ................................................................42

*Balt. Harbor Charters, Ltd. v. Ayd*,
    780 A.2d 303 (Md. 2001) .............................................................................20

*Banneker Ventures, LLC v. Graham*,
    798 F.3d 1119 (D.C. Cir. 2015) ....................................................................34

*Billups v. Lab. Corp. of Am.*,
    No. CV 16-1502 (RJL), 2017 WL 435723 (D.D.C. Jan. 30, 2017).........................34

*Blackman v. Lincoln Nat'l Corp.*,
    10-cv-6946, 2012 WL 6151732 (E.D. Pa. Dec. 10, 2012) .........................31, 32, 33

* *Bluestein v. Cent. Wis. Anesthesiology, S.C.*,
    769 F.3d 944 (7th Cir. 2014) ................................................................. passim

* *Bowers v. Ophthamology Grp., LLP*,
    No. 5:12–CV–00034–JHM, 2012 WL 3637529. (W.D. Ky. Aug. 22, 2012),
    *vacated on other grounds*, 733 F.3d 647 (6th Cir. 2013) ..............................27, 29

* *Bragg v. Orthopaedic Assocs. of Va.*,
    No. 2:06-cv-347, 2007 WL 702786 (E.D. Va. Mar. 2, 2007)................22, 24, 25, 29

*Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*,
    98 F.3d 13 (2d Cir. 1996) ............................................................................44

*C3 Media & Marketing Group LLC v. Firstgate Internet, Inc.,*
    419 F. Supp. 2d 419 (S.D.N.Y. 2005)...................................................................45

\* *Chairman of Bd. of Trustees of Emp. Ret. Sys. v. Waldron,*
    285 Md. 175, 401 A.2d 172 (1979) ...................................................................31

*Chambers v. NASA Federal Credit Union,*
    -- F. Supp. 3d --, 2016 WL 6155930 (D.D.C. 2016) ...............................................34

\* *Chowaiki & Co. Fine Art v. Lacher,*
    115 A.D.3d 600, 982 N.Y.S.2d 474 (2014) .........................................................38

\* *Clackamas Gastroenterology Associates, P.C., v. Wells,*
    538 U.S. 440 (2003)..................................................................................... passim

*Coldiron v. Clossman Catering, LLC,*
    No. 1:14-CV-300, 2015 WL 9583387 (S.D. Ohio Oct. 27), *report &*
    *recommendation adopted,* No. 1:14CV300, 2015 WL 9489789 (S.D. Ohio
    Dec. 30, 2015)..........................................................................................19

\* *Coleman v. New Orleans & Baton Rouge S.S. Pilots' Ass'n,*
    437 F.3d 471 (5th Cir. 2006) ...................................................................23, 27

*Consumer Prot. Div. v. Outdoor World Corp.,*
    91 Md. App. 275, 603 A.2d 1376 (1992)............................................................31

\* *Cooper Development Co. v. Friedman,*
    No. 92 Civ. 7572 (JSM), 1994 WL 62846 (S.D.N.Y. 1994) ..................................39

\* *Cronkhite v. Unity Physician Group, P.C.,*
    No. 1:05-cv-1577-SEB, JMS, 2007 WL 1035091 (S.D. Ind. Mar. 30, 2007) .......22, 24, 25, 29

\* *Day v. Sidley & Austin,*
    394 F. Supp. 986 (D.D.C. 1975)...................................................................39

*E.E.O.C. v. CRST Van Expedited, Inc.,*
    No. 07-cv-95, 2009 WL 1586193, at *19 (N.D. Iowa June 2, 2009), *aff'd,* 670
    F.3d 897 (8th Cir. 2012), *withdrawn from bound volume, opinion vacated on*
    *other grounds & superseded on reh'g,* 679 F.3d 657 (8th Cir.), *and aff'd,* 679
    F.3d 657 (8th Cir. 2012) ..............................................................................33

*EEOC v. Sidley Austin Brown & Wood,*
    315 F.3d 696 (7th Cir. 2002) ......................................................................28

*Elhusseini v. Compass Grp. USA, Inc.,*
    578 F. Supp. 2d 6 (D.D.C. 2008) ..................................................................19

* *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*,
   837 F. Supp. 2d 162 (S.D.N.Y. 2011)......................................................42, 44

* *Elyazidi v. SunTrust Bank*,
   13-cv-2204, 2014 WL 824129 (D. Md. Feb. 28, 2014), *aff'd*, 780 F.3d 227
   (4th Cir. 2015)..................................................................................31

*Escobar v. GCI Media, Inc.*,
   No. 08-21956-CIV, 2009 WL 1758712 (S.D. Fla. June 22, 2009)........................18

*Evans v. Wash. Ctr. for Internships & Acad. Seminars*,
   587 F. Supp. 2d 148 (D.D.C. 2008) ...........................................................19

*Falconi-Sachs v. LPF Senate Square, LLC*,
   142 A.3d 550 (D.C. 2016) ......................................................................42

*Fischer & Mandell, LLP v. Citibank, N.A.*,
   632 F.3d 793 (2d Cir. 2011).....................................................................35

*Fuentes-Fernandez & Company, PSC v. Corvus Group, Inc.*,
   174 F. Supp. 3d 378 (D.D.C. 2016) (Jackson, J.) .........................................35

* *Furman v. Cirrito*,
   828 F.2d 898 (2d Cir. 1987).....................................................................39

*Gaskins v. Marshall Craft Assocs., Inc.*,
   678 A.2d 615 (Md. App. 1996)..................................................................20

*Glunt v. GES Exposition Servs., Inc.*,
   123 F. Supp. 2d 847 (D. Md. 2000) ...........................................................20

* *Habitzreuther v. Cornell Univ.*,
   No. 5:14-cv-1229, 2015 WL 5023719 (N.D.N.Y. Aug. 25, 2015)........................37

*Hishon v. King & Spalding*,
   467 U.S. 69 (1984) (J. Powell, concurring) ..................................................21

*Hoffman v. Parade Publ'ns*,
   15 N.Y.3d 285, 933 N.E.2d 744 (2010).................................................32, 33

*J.E. Morgan Knitting Mills v. Reeves Bros., Inc.*,
   243 A.D.2d 422 (1st Dep't 1997)...............................................................45

*Jacobsen v. Oliver*,
   555 F. Supp. 2d 72 (D.D.C. 2008)..............................................................41

*Judkins v. St. Joseph's Coll. of Me.*,
   483 F. Supp .2d 60, 65 (D. Me. 2007) ........................................................33

\* *Kirleis v. Dickie, McCamey & Chilcote, P.C.*,
No. 06CV1495, 2009 WL 3602008 (W.D. Pa. Oct. 28, 2009), *aff'd*, No. 09-
4498, 2010 WL 2780927 (3d Cir. July 15, 2010) ............................................................. passim

\* *LoFrisco v. Winston & Strawn LLP*,
10 Misc. 3d 1066(A) (Sup. Ct., N.Y. Cty. 2005) ..............................................................35

\* *Mandarin Trading Ltd. v. Wildenstein*,
944 N.E.2d 1104 (N.Y. 2011) ..............................................................42

\* *Margrabe v. Sexter & Warmflash P.C.*,
353 F. App'x 547 (2d Cir. 2009) ..............................................................40

*Mariotti v. Mariotti Bldg. Prods.*,
714 F.3d 761 (3d Cir. 2013) ..............................................................26

\* *Marshall v. GE Marshall, Inc.*,
No. 2:09-cv-198 APR, 2014 WL 1414864 (N.D. Ind. Apr. 14, 2014) ..............................26

*Miles v. Howard Univ.*,
83 F. Supp. 3d 105, 114 ..............................................................19

*Miles v. Howard Univ.*,
83 F. Supp. 3d (D.D.C. 2015), *aff'd*, 653 F. App'x 3 (D.C. Cir. 2016) ...........................20, 23

\* *Morgenweck v. Vision Capital Advisors, LLC*,
2010 WL 9478990 (S.D.N.Y. June 3, 2010) ..............................................................41

*Murphy v. LivingSocial, Inc.*,
931 F. Supp. 2d 21 (D.D.C. 2013) ..............................................................34, 35

*Murphy v. PricewaterhouseCoopers, LLP*,
813 F. Supp. 2d 45 (D.D.C. 2011) ..............................................................32

*Nationwide Mut. Ins. Co. v. Darden*,
503 U.S. 318 (1992) ..............................................................18

*Opan Realty Corp. v. Pedrone*,
36 N.Y.2d 943 (1975) ..............................................................36

\* *PetEdge, Inc. v. Garg*,
-- F. Supp. 3d--, 2017 WL 564088 (S.D.N.Y. Feb. 10, 2017) ..............................................42

\* *Phansalkar v. Andersen Weinroth & Co., L.P.*,
No. 00 CIV. 7872 (SAS), 2002 WL 1402297 (S.D.N.Y. June 26, 2002), *aff'd
in part, vacated in part*, 344 F.3d 184 (2d Cir. 2003) ..............................................................35

*Rather v. CBS Corp.*,
    68 A.D.3d 49, 886 N.Y.S.2d 121 (2009) ...................................................................38

*Ray Legal Consulting Group v. DiJoseph*,
    37 F. Supp. 3d 704 (S.D.N.Y. 2014)........................................................................39

* *Renaud v. Young Men's Christian Ass'n Ret. Fund*,
    2012 WL 363561 (S.D.N.Y. Feb. 3, 2012)............................................................40

* *Roan v. Keck, Mahin & Cate*,
    962 F.2d 10 (7th Cir. 1992) ....................................................................................36

* *Robin Bay Associates, LLC v. Merrill Lynch & Co.*,
    2008 WL 2275902 (S.D.N.Y. June 3, 2008) ........................................................38

* *Rodal v. Anesthesia Group of Cent. N.Y.*,
    No. 00-CV-1386, 2006 WL 208835 (N.D.N.Y. Jan. 23, 2006)...............................22

*Smith v. Mikki More, LLC*,
    59 F. Supp. 3d 595, 614 (S.D.N.Y. 2014).............................................................41

* *Solon v. Kaplan*,
    398 F.3d 629 (7th Cir. 2005) ...............................................................18, 26, 28

* *Sullivan & Cromwell LLP v. Charney*,
    15 Misc. 3d 1128(A), (Sup. Ct., N.Y. Cty. Apr. 30, 2007)....................................40

* *Telecom Int'l Am., Ltd. v. AT&T Corp.*,
    280 F.3d 175 (2d Cir. 2001)...................................................................................44

* *Thomas v. Sotera Defense Solutions, Inc.*,
    40 F. Supp. 3d 181 (D.D.C. 2014) (Jackson, J.) ...................................................32

* *Tutak v. Tutak*,
    123 A.D.2d 758 (2d Dep't 1986) ...........................................................................43

*Union Underwear Co. v. Barnhart*,
    50 S.W.3d 188 (Ky. 2001) ......................................................................................33

*Vill. on Canon v. Bankers Trust Co.*,
    920 F. Supp. 520 (S.D.N.Y. 1996)..........................................................................37

* *W.B. David & Co., Inc. v. DWA Commc'ns, Inc.*,
    No. 02 Civ. 8479 (BSJ), 2004 WL 369147 (S.D.N.Y. Feb. 26, 2004) ....................45

*Wash. Convention Ctr. Auth. v. Johnson*,
    953 A.2d 1064 (D.C. 2008) ....................................................................................19

\* *Weir v. Holland & Knight, LLP*,
34 Misc. 3d 1207(A), 943 N.Y.S.2d 795 (Sup. Ct. N.Y. Cty. 2011).....................21, 27, 40, 45

\* *William Kaufman Organization, Ltd. v. Graham & James L.L.P.*,
269 A.D.2d 171 (1st Dep't 2000) .............................................................................37, 38

*Zang v. W. Pa. Teamsters*,
No. CV 14-1651, 2016 WL 1043188 (W.D. Pa. Mar. 16, 2016)............................................19

\* *Ziegler v. Anesthesia Assocs. of Lancaster, Ltd.*,
74 F. App'x 197 (3d Cir. 2003) ..............................................................................30

## STATUTES

29 U.S.C § 203(e)(1)...........................................................................................16, 18, 19

29 U.S.C § 206(d) .............................................................................................16, 18

29 U.S.C. § 2611(2)(A)........................................................................................16, 18

29 U.S.C. § 2611(3) ...........................................................................................16, 18

42 U.S.C. § 2000e(f) ...........................................................................................19

D.C. Code § 2-1401.02(9).......................................................................................19

D.C. Code § 2-1402.11(a)(1) ...................................................................................16, 19

D.C. Code § 32-501(1)..........................................................................................16, 19

D.C. Code §§ 32-502, 32-503 .................................................................................19

Md. Code Ann., Lab. & Empl. § 3-301(b)(1) ...................................................................31

Md. Code Ann., Lab. & Empl. § 3-304(b)(1) ...................................................................31

Md. Code Ann., Lab. & Empl. § 9-203 .........................................................................31

Md. Code, Lab. & Empl., § 3-307(a) .......................................................................16, 20

## OTHER AUTHORITIES

Fed. R. Civ. P. 12(b)(1)........................................................................................32

Fed. R. Civ. P. 12(b)(6)........................................................................................34

Fed. R. Civ. P. 56 ...........................................................................................17, 34

4 D.C.M.R. § 1602.1...........................................................................................20

4 D.C.M.R. § 1602.5.............................................................................................................20

D.C. Rule of Prof. Conduct 9.1..........................................................................................40

N.Y. Rule of Prof. Conduct 8.4(g) ....................................................................................40

1991 Maryland Laws Ch. 8.................................................................................................32

## PRELIMINARY STATEMENT

Defendant Proskauer Rose LLP ("Proskauer" or the "Firm") respectfully submits this statement of point and authorities in support of its motion to dismiss and for summary judgment with respect to the claims asserted by its partner, Plaintiff "Jane Doe" ("Plaintiff" or "Doe").

This case is not about gender, nor is it about the relationship between an employer and an employee. It is instead about a single business owner's discontent that her substantial allocation of Firm profits fell short of her ambitions. Proskauer asks this Court to dismiss this lawsuit because, even putting aside the utter falsity of Plaintiff Jane Doe's allegations of gender discrimination and retaliation, Doe is a highly compensated business owner who bargained for and enjoyed the authority and benefits of law firm equity partnership, but now seeks to invoke statutes that only protect the interests of employees and are inapplicable to disagreements among business owners in a shared enterprise.

Plaintiff is an equity partner of the Firm who, when she joined Proskauer four years ago, contractually agreed to be assessed by the same, multi-faceted allocation criteria as all other equity partners; who had ample opportunity to participate in the thorough process by which her allocation of Firm profits was decided; and who brings this suit because an Executive Committee comprised of duly elected female and male equity partners refused to capitulate to her insistence that, when assessing her performance, they focus only on the few statistics she deemed most favorable to her. Contrary to the system Doe wishes the Firm employed, Proskauer's equity partner allocations reward multiple forms of partner contribution and, among other things, support the development of more junior partners (many of whom are women) as they seek to navigate the highly competitive landscape of law firm practice in the 21st Century. As the Firm's Executive Committee emphatically stated to equity partners each year Doe was a partner:

"[i]f metrics were all that counted we could simply ask a member of the finance staff to multiply one or more of the metric columns by a percentage.  The allocation process would take only hours but would invariably lead to a ruinous focus on limited, and often inadequate, measures of contribution.... [I]t is . . . a disservice to the process, when partners . . . form adverse judgments about the allocations made to others solely by comparing the metrics." (Declaration of Joseph M. Leccese, Esq. in Support of Motion for Summary Judgment, dated June 13, 2017 ("Leccese Decl."), Ex. 2 at 5, Ex. 3 at 6-7, Ex. 4 at 11, & Ex. 5 at 9.)[1]

As Proskauer would demonstrate if this case required full litigation, which it does not, the Firm's allocation system (befitting a Firm with a longstanding commitment to diversity and inclusion) results in the median amounts distributed to its male and female equity partners being *identical*, while the average amounts were close to identical (approximately 94%).  That allocation system also has allowed Proskauer to achieve a level of partner collaboration, Firm success and resulting profitability that enabled it to allocate to Doe enormous sums relative to her contribution, ranging from $██████ in FY 2013 (pro-rated for her first year at the Firm) to $█████ in FY 2016.

## SUMMARY OF LEGAL ARGUMENT

As a threshold legal matter, Doe is not entitled to bring suit under the federal and state anti-discrimination laws she has invoked because she is a partner and owner of the Firm, not an employee.

In *Clackamas Gastroenterology Associates, P.C., v. Wells*, 538 U.S. 440 (2003), the Supreme Court set forth the multi-factor test to apply when determining whether a plaintiff is a statutory employee, who may invoke the protections of the anti-discrimination statutes, or a

---

[1]   All references to numbered exhibits refer to the exhibits to the Leccese Declaration.

business owner and employer, who is not covered by those statutes.  The multi-factor test reflects the common law notion of control – *i.e.*, whether the plaintiff functions as an employee subject to the oversight and control of the defendant, or whether the plaintiff serves as an employer, with the benefits and right of control over the business.

Here, the indisputable facts demonstrate that Doe enjoys all of the privileges of a partner and business owner.  She was admitted to the Firm by a vote of the Firm's partners (and no partner can be admitted without such a vote); she provides services to clients free from oversight and supervision by Firm management; she is able to influence the Firm by voting on important Firm matters, including the election of the Firm's Executive Committee and the Firm's Chair (and she has the right to nominate herself for election to those positions and to serve in those positions if elected); she is treated as a partner and owner, not an employee, under the Firm's Partnership Agreement; she contributes capital to the Firm (and bears the risk of loss of that capital); and she shares in the profits, losses and liabilities of the Firm.  Equity partners of the Firm, including Doe, have equal votes on matters of significance to the Firm, and thus no one equity partner has greater authority with respect to voting than any other equity partner.  Accordingly, under *Clackamas*, Doe is not an "employee" entitled to bring suit under the federal and state anti-discrimination laws she has invoked.

In addition, Doe cannot pursue her claims under Maryland law because she does not plead facts sufficient to show that she is a resident of Maryland or that she experienced the impact of the Firm's alleged conduct in Maryland.

Doe's common law claims, which hinge on her allegation that the Firm breached its Partnership Agreement, also should be dismissed.   Doe fails to state a breach of contract claim as a matter of law because the Partnership Agreement she relies on grants to the Executive

Committee discretion to allocate the Firm's profits among its partners. Having agreed to vest

that Committee with the discretion to set partner allocations, Doe cannot possibly assert that the

Firm breached its Partnership Agreement simply because she is unhappy with the sizeable

allocation of profits she received. Moreover, Doe's common law claims are nothing more than

an attempt to recast her failed breach of contract claim as a business tort. Her breach of fiduciary

duty claim fails because it is duplicative of her contract claim and because she cannot premise a

breach of fiduciary duty on the ethical rules that govern attorney conduct in an attempt to

circumvent *Clackamas*. Her unjust enrichment claim fails because Doe's relationship with the

Firm is governed by the Partnership Agreement to which she agreed when she joined as an

equity partner. Finally, Doe's fraudulent misrepresentation claim fails because it is simply a

repackaged breach of contract claim and because she has not alleged any misrepresentation of

existing fact sufficient to state a fraudulent misrepresentation claim as a matter of law.

## STATEMENT OF MATERIAL UNDISPUTED FACTS[2]

Proskauer is an international law firm of approximately 740 lawyers in 13 offices around

the world. (Leccese Decl. ¶ 3.) Proskauer is particularly well known for the ██████

██████ Department in which Doe practices, and has long been recognized for its

achievements in the areas of diversity and inclusion. (*Id.* ¶ 4.) In 2017, the Firm was shortlisted

for the Euromoney Women in Business Law (Americas) Awards in several categories, including

best international firm for women in business law and best international firm for diversity. (*Id.*)

The Firm was also nominated by Chambers in 2016 as one of the most inclusive firms for

minority lawyers; has been honored in the "Gender Equity" category by the Yale Law Women's

2015 Top Ten Family Friendly Firms Survey; and, in 2014 and 2015, received Gold Standard

---

[2] In accordance with Local Civil Rule ("LCvR") 7(h)(1), Defendant is submitting a separate
Statement of Material Facts as to Which There is No Genuine Issue with this motion.

Certifications from the Women in Law Empowerment Forum.  (*Id.*)  The Firm has also received

recognition for its diversity initiatives, including its Women's Sponsorship Program, which pairs

women associates with partner sponsors and provides supplemental training for the express

purpose of being able to increase the number of women partners at the Firm.  (*Id.* ¶ 5)  The

Program also provides sponsors and training to newly promoted women partners and senior

counsel to support their ability to succeed as senior lawyers and future Firm leaders.  (*Id.*)

**A.      The Firm's Partnership Agreement**

Proskauer is a New York limited liability partnership.  (*Id.* ¶ 6.)  The relationships among

its partners are governed by its Partnership Agreement, which itself is governed by New York

law.  (*Id.* ¶ 7; Ex. 1 § 23.)  The Firm's principal office is located in New York and the Firm

maintains twelve other offices, including an office in Washington, D.C.  (Leccese Decl. ¶ 7; Ex.

1 § 4.)  The Firm does not maintain an office in Maryland.  (Leccese Decl. ¶ 7.)  Each equity

partner of the Firm, including Doe, has agreed to the Firm's Partnership Agreement.  (*Id.* ¶ 9.)

The rights and obligations of all equity partners are governed by the Partnership Agreement,

except to the extent specifically modified by an individual agreement between the partner and the

Firm.[3]  (*Id.*; Ex. 1 § 3.)

**B.      Equity Partner Voting on Firm Affairs**

The Firm's partners have the right under the Partnership Agreement to direct the Firm by

voting on matters of significance.  (Leccese Decl. ¶ 10; Ex. 1 § 6.)  The Partnership Agreement

provides for a "weighted vote" system in which each equity partner has three votes and, on

---

[3] The Firm has two types of active partners:  equity partners and income partners.  (Leccese
Decl. ¶ 8.)  Doe is an equity partner.  (*Id.*)  The term "regular partner" in the Partnership
Agreement means an equity partner.  (*Id.*)  The term "contract partner" in the Partnership
Agreement includes both equity partners whose relationship with the Firm is governed in part by
a separate agreement with the Firm, and income partners whose rights are different than equity
partners.  (*Id.*, Ex. 1 § 3.)

matters on which they are entitled to vote, each income partner has one vote.  (Leccese Decl. ¶ 10; Ex. 1 § 6(e).)  Under Section 6 of the Agreement, a 75% vote of the partners is required in order to:  (i) admit new partners to the Firm; (ii) amend the Partnership Agreement; (iii) change the name of the Firm; (iv) establish additional Firm offices; or (v) vote on any other matter submitted to a vote of the partners by the Executive Committee or by 25% of the Firm's partners (unless a lesser vote has been specified in the Partnership Agreement).  (Leccese Decl. ¶ 11; Ex. 1 §§ 6(a)(i)-(vi), 9.)  In addition, the Firm's principal office can be relocated upon a two-thirds vote of all equity partners in which each equity partner is entitled to one vote.  (Leccese Decl. Leccese Decl. ¶ 11; Ex. 1 § 4.)  The Agreement further requires that partners vote to approve all decisions to:  (i) expel a partner from the Firm upon the recommendation of the Executive Committee; (ii) merge with another law firm; or (iii) terminate the partnership, with a 75% weighted vote of all partners entitled to vote required to approve such actions.  (Leccese Decl. ¶ 12; Ex. 1 §§ 6(a)(x)-(z).)

The Partnership Agreement provides for meetings of the partners at least monthly to discuss or decide matters that require a decision by the partners, and at which decisions made by the Executive Committee are reported to the partners.  (Leccese Decl. ¶ 13; Ex. 1 § 5(e).)  Any partner may request that a matter be placed on the agenda of the partners' meeting for discussion among the partners.  (*Id.*)

## C.      **The Firm's Executive Committee**

Pursuant to the Partnership Agreement, the Firm's partners, who retain ultimate control over the Firm, have conferred on the Executive Committee responsibility for "matters of management, policy and operations."  (Leccese Decl. ¶ 14; Ex. 1 § 5(c).)  As the Partnership Agreement explains, the Executive Committee's authority to manage the operations of the Firm

"derives from and is delegated by the partners." (Leccese Decl. ¶ 14; Ex. 1 § 5(a).)  The

Agreement makes clear that any and "[a]ll authority not delegated [to the Executive Committee

under the Partnership Agreement] is retained by the partners." (*Id.*)  The Partnership Agreement

reinforces the Executive Committee's authority to make decisions on delegated matters by

stating that "if by the express terms of [the Partnership] Agreement any matter is to be

determined by the Executive Committee or by decision of the partners . . . it shall be so

determined or decided, and every such determination or decision shall be final and binding

for purposes of this Agreement and not subject to review or modification in any arbitration

or judicial proceeding." (Leccese Decl. ¶ 15; Ex. 1 § 22.)

As set forth in the Partnership Agreement, the Executive Committee's responsibilities

include the:

> (i) determination of fees, profits, expenses, and accounting
> practices, (ii) allocation of profits among and distribution of profits
> to the partners, (iii) authorization of banking and safe deposit
> accounts and signatures, (iv) incurring of capital expenditures, (v)
> investing funds of the Partnership, (vi) borrowing on behalf of the
> Partnership, (vii) hiring and discharging of employees, (viii)
> determinations regarding acceptance of client representation and
> resolution of conflicts arising in the course of such representation,
> (ix) determination of all matters relating to the Firm's insurance
> and its pension, group life and other plans, (x) equipment and other
> purchases, (xi) negotiation and execution on behalf of the
> Partnership of all leases and contracts, (xii) interpretation of this
> Agreement and (xiii) all other matters as to which no other or
> inconsistent provision has been made in this Agreement.

(Leccese Decl. ¶ 16; Ex. 1 § 5(c).)  Under the Partnership Agreement, the Executive Committee

may appoint other committees to assist in carrying out its functions, and it also appoints

chairpersons to head each of the Firm's departments after giving due consideration to the views

of the partners in each department.  (Leccese Decl. ¶ 17; Ex. 1 §§ 5(b), (f).)  Although the

Executive Committee has the authority to manage the Firm's affairs under the Partnership

Agreement, the Executive Committee is also required to submit to the partners any matter that

three Executive Committee members "deem of sufficient importance to merit discussion or

decision by the partners." (Leccese Decl. ¶ 18; Ex. 1 § 5(c).)  Thus, the Executive Committee

can – and, at times does – ask the partners to vote on matters that the Executive Committee

would otherwise have the authority to decide on its own.  (Leccese Decl. ¶ 18.)  Ultimately,

however, the Executive Committee must report to the partners – as it does in monthly meetings –

on decisions made by the Executive Committee on behalf of the Firm.  (*Id.*; Ex. 1 § 5(e).)

        The Executive Committee consists of seven members, including the Firm's Chair.

(Leccese Decl. ¶ 19; Ex. 1 § 7(a)(1).)  The Firm's partners elect the Committee members and the

Chair through the weighted voting procedure described above.  (Leccese Decl. ¶ 19; Ex. 1 §

6(c).)  Elections are conducted by secret ballot and partners may vote in person or by proxy.

(Leccese Decl. ¶ 19; Ex. 1 § 6(g), Exhibit A.)  A candidate who receives a majority of the votes

cast is elected to the position.  (Leccese Decl. ¶ 19; Ex. 1 § 6(c).)  All equity partners, including

Doe, are eligible to run for Chair or a seat on the Executive Committee.  (Leccese Decl. ¶ 20; Ex.

1 §§ 5(b), 7(c).)  There is no nominating committee that controls who runs for a position.  (*Id.*)

Each equity partner is simply asked whether s/he wishes to have her/his name included on the

ballot for election to the position.  (Leccese Decl. ¶ 20; Ex. 1 Exhibit A, ¶ 2.)  If s/he wants to be

included, his/her name will be on the ballot.  (Leccese Decl. ¶ 20; Ex. 1 Exhibit A, ¶¶ 4, 5.)

        The Firm's current Chair, who has served as the Chair at all times relevant to this action,

is Joseph M. Leccese.  (Leccese Decl. ¶ 2.)  The Chair presides at partner meetings and

Executive Committee meetings, and serves a three-year term.  (*Id.* ¶ 21; Ex. 1 §§ 5(d), 7(a)(2).)

Executive Committee members also serve three-year terms, which are staggered so that two of

the six members' terms expire each year.  (Leccese Decl. ¶ 21, Ex. 1 §§ 7(a)(2)-(3).)  Executive

Committee members, other than the Chair, may not serve consecutive terms. (Leccese Decl. ¶ 22; Ex. 1 §§ 7(a)(3).) With limited exceptions, no more than two partners on the Committee can be from any one department, and none of the Firm's offices may have more than six members on the Executive Committee, including the Chair. (Leccese Decl. ¶ 22; Ex. 1 §§ 7(a)(5).) In 2014 and 2015, two of the seven Executive Committee members were women, and in 2016, one of the seven Executive Committee members was a woman. (Leccese Decl. ¶ 22.) These are the only years at issue in this dispute. (Compl. ¶¶ 4, 7.)

**D.**     **Allocation of Profits and Losses Among Equity Partners; Capital Contributions**

The Firm's equity partners, including Doe, share in the profits and losses of the Firm. (Leccese Decl. ¶ 23; Ex. 1 § 11.) They also contribute capital to the Firm annually in an amount equal to 7% of their share of the Firm's profits for the year, subject to certain limitations. (Leccese Decl. ¶ 23; Ex. 1 § 12(a).) The Partnership Agreement requires that "[t]he profits of the Firm each year shall be allocated among the partners by the Executive Committee," and that "[i]f the Firm shall incur net losses, such net losses shall be chargeable to the partners in such a manner as is determined by the Executive Committee . . . ." (Leccese Decl. ¶ 24; Ex. 1 § 11.)

**E.**     **Partner Allocations**

Unlike many other law firms, Proskauer does not have "points" or "shares" or any metrics that "entitle" a partner to any particular allocation in a given year. (Leccese Decl. ¶ 25.) Rather, in an effort to allocate the Firm's profits in a way that fairly rewards each partner's overall contribution to the Firm's success and incentivizes Firm-minded behavior, the Executive Committee undertakes a thorough year-end review of each partner's performance on a host of quantitative and qualitative factors related to both short-term and long-term contributions. (*Id.*)

In conducting its annual allocation process, the Executive Committee takes into account the myriad ways in which partners contribute to the Firm's success.  (*Id.* ¶ 26.)  Accordingly the Firm's allocation system reflects the fundamental values, culture and expectations of the Firm's partners, including teamwork, mutual respect, and a "client and Firm first" philosophy.  (*Id.*)

Each year Doe was a partner, the Executive Committee emphasized in its annual memorandum (which was sent to Doe and all other equity partners (*id.* ¶ 27)) that in determining allocations it "did not make any decisions – up or down – based on a single year's performance" (*Id.* ¶ 28; Ex. 2 at 2, Ex. 3 at 4) and that it did not base allocations on "the vagaries of a single year." (Leccese Decl. ¶ 28; Ex. 4 at 9, Ex. 5 at 7.)  Rather, the Executive Committee made clear that it "rigorously examined three-year (and longer) averages and the totality of each partner's long term contributions" (Leccese Decl. ¶ 28; Ex. 2 at 2, Ex. 3 at 4) and that it made allocation decisions "based on the totality of that partner's contribution over a period of years." (Leccese Decl. ¶ 28; Ex. 4. at 9, Ex. 5 at 7.)  Partner allocations are not tied to one year's financial performance, but take into account the totality of the partner's contributions over several years. (Leccese Decl. ¶ 28.)  Similarly, the Executive Committee has advised the Firm's equity partners that "no metric should be viewed as dispositive," and "each has its limitations." (Leccese Decl. ¶ 29; Ex. 2 at 4, Ex. 3 at 5.)  It is the Executive Committee's role to "carefully assess all metric and non-metric information."  (Leccese Decl. ¶ 29; Ex. 2 at 4.)

In explaining to partners the review it undertakes each year, the Executive Committee has stressed "the laborious and nuanced process we go through in attempting to understand more fully the entirety of each partner's contributions to our collective well-being, the fairness of relative placement and the importance of all the factors not reflected on [the allocation] schedule, including the non-metric factors set forth in the statement of Our Fundamental Partnership

Values." (Leccese Decl. ¶ 30; Ex. 2 at 5, Ex. 3 at 6, Ex. 4 at 11, Ex. 5 at 9; *see also* ¶ 31, Ex. 6.)

Those values include, among other things, acting as a business owner and fiduciary, practicing at

the highest level of quality and integrity, abiding by ethical and legal standards, operating as a

consummate team player, adhering to sound practice management, sharing credit with others and

ensuring that the Firm prospers for future generations. (Leccese Decl. ¶ 31; Ex. 6.) As the

Executive Committee emphatically repeated each year Doe was a partner:

> [i]f metrics were all that counted we could simply ask a member of the
> finance staff to multiply one or more of the metric columns by a
> percentage. The allocation process would take only hours but would
> invariably lead to a ruinous focus on limited, and often inadequate,
> measures of contribution….[I]t is … a disservice to the process, when
> partners . . . form adverse judgments about the allocations made to others
> solely by comparing the metrics. (Leccese Decl. ¶ 32; Ex. 2 at 5, Ex. 3 at
> 6-7, Ex. 4 at 11, Ex. 5 at 9.)

The annual allocation process begins each year with the distribution of a memorandum to

all partners in early to mid-October[4] in which the Executive Committee invites partners to submit

memoranda outlining their contributions to the Firm and the contributions made by their

colleagues, so that the Executive Committee has as much information as possible when making

allocation decisions. (Leccese Decl. ¶ 33.) As the Executive Committee has explained, partner

memos "provide valuable information [to the Committee] on a variety of economic and non-

economic matters that cannot be measured solely by the year-end metrics available to us."

(Leccese Decl. ¶ 34; Ex. 7 at 1, Ex. 8 at 1, Ex. 9 at 1.)

The annual memoranda prepared by partners are sent not only to the Executive

Committee, but also to the partner's Department Chairs and office heads for review and

discussion. (Leccese Decl. ¶ 35.) Although the Department Chairs and office heads do not set

allocations for the Firm's partners, they are available to meet with each partner to review his/her

---

[4] The Firm's fiscal year runs from November 1 to October 31. (Leccese Decl. ¶ 33; Ex. 1 § 10.)

memorandum and discuss any questions, issues or concerns that the partner may wish to raise in advance of the Firm's annual allocation decisions, and Department Chairs and office heads then provide input to the Executive Committee for its consideration.   (*Id.*)

After partner memoranda are submitted to the Executive Committee for consideration, members of the Executive Committee make themselves available to meet with any partner who wishes to discuss his/her contributions, as well as the contributions of other partners.   (*Id.* ¶ 36.) Following these meetings, and after the Executive Committee has considered each partner's contributions to the Firm, the Committee makes final allocation decisions and communicates those decisions to the partners in December of each year.   (*Id.*)  In accordance with Section 22 of the Partnership Agreement, such allocation decisions – which are entrusted to the Executive Committee by the partners – are "final and binding for purposes of [the Partnership] Agreement and not subject to review or modification in any arbitration or judicial proceeding."  (*Id.* ¶ 37, Ex. 1 § 22.)

To assure the transparency of the allocations process, each of the Firm's equity partners receives a report each December specifying the allocation paid to each partner and reflecting various metrics applicable to each partner – including cash collected per hour worked by the partner, revenue from clients originated by the partner, revenue from clients for which the partner had relationship responsibility, revenue from client matters for which the partner had responsibility, revenues from matters on which the partner worked, the realization rates associated with such revenue, and hours billed.[5]  (Leccese Decl. ¶ 38.)  The report provides data

---

[5] Realization, as measured at Proskauer, includes two different metrics – one that approximates the fees collected as a percentage of the fees accrued at specified rates on client matters, and a second that reflects a "hypothetical" realization that approximates the fees collected as a percentage of the fees that would have accrued at rates attorneys should reasonably charge for their services based on their years of experience.  (Leccese Decl. ¶ 39.)

for each of those metrics for the immediately preceding year and as an average for the three preceding years. (*Id.*) In addition, the individual partner memoranda prepared by each partner are available for review by all partners after the allocation process is complete. (*Id.*)

Equity partners are responsible for paying their own individual taxes on allocated Firm income. (*Id.* ¶ 40.) The allocations paid to equity partners are reported on a Schedule K-1, which is the IRS Schedule used to report profits and loss of self-employed business owners of a partnership. (*Id.*)

## F.    The Firm's Partners Operate as Business Owners

Proskauer's equity partners are business owners, who have autonomy over their work and do not report to "management" as would an "employee." (Leccese Decl. ¶ 41.) Among other things, the Firm's partners have broad latitude in bringing business into the Firm, subject to the Firm's conflicts procedures, billing and collection guidelines, risk management and similar policies, all of which are set by the Executive Committee pursuant to the express grant of authority in the Partnership Agreement.[6] (*Id.*; Ex. 1 § 5(c).) Subject to these policies, the Firm's equity partners, including Doe, also have discretion over the manner in which they provide services to the Firm's clients and manage their work, and they are not subject to oversight or supervision by the Executive Committee. (Leccese Decl. ¶ 42.) In the case of litigators like Doe, for example, partners routinely advise clients on litigation avoidance, confer with clients on litigation strategy and file court documents, all without any oversight by the Executive Committee. (*Id.*) The autonomy and discretion exercised by equity partners distinguishes them

---

[6] Specifically, and as noted above, the partnership has vested in the Executive Committee the authority to "determin[e] the fees, profits, expenses, and accounting practices of the Firm," as well as the authority to make "determinations regarding acceptance of client representations and resolution of conflicts arising in the course of such representations." (Leccese Decl. ¶ 41, n.2; Ex. 1 § 5(c).)

13

from the Firm's associates or other Firm employees who are subject to supervision by the Firm, including by the partners (such as Doe) who oversee client matters. (*Id.* ¶ 43.)

The Firm's partners also have wide-ranging access to the Firm's financial information. (*Id.* ¶ 44.) Pursuant to Section 5(e) of the Partnership Agreement, partners are entitled to financial information and other materials to be discussed at monthly partner meetings (*Id.,* Ex. 1 § 5(e)); and, in fact, detailed financial data – including revenue, billings, collections, hours and other metrics – is presented to all partners during monthly partnership meetings. (Leccese Decl. ¶ 44.) In addition, access to Firm financial data is available to equity partners through the Partner Portal on the Firm's intranet. (*Id.*)

Furthermore, as described above, all equity partners receive at the time of profit allocations annual and three-year average data on partner allocations, cash collected per hour worked, four categories of revenue credit, and realization rates for each partner of the Firm. (*Id.* ¶ 45.) Thus, in addition to having the right to cast three votes in partnership votes, equity partners also have extensive access to individual allocations and other financial metrics on their fellow partners. (*Id.*) Income partners and other employees of the Firm are not given access to this financial information about equity partners. (*Id.*)

**G.      Doe's Tenure with the Firm**

Doe joined Proskauer as an equity partner in the ▮▮▮▮▮▮▮▮▮▮ Department in ▮▮▮▮▮▮ 2013, and has been a partner for the past four years in the Firm's Washington D.C. Office. (Leccese Decl. ¶ 46.) Doe came to the Firm after having spent ▮▮▮▮▮ as a partner at ▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮▮ as a partner at ▮▮▮▮▮▮▮. (*Id.*) Like all prospective partners, Doe's admission to the partnership was approved by a vote of the partners, and upon joining the Firm she agreed to the Partnership Agreement. (*Id.*)

14

When Doe joined the Firm, in addition to agreeing to the Partnership Agreement, she and the Firm agreed that while she would be a regular equity partner for all other purposes, her allocation would be guaranteed for 2013 and, subject to certain terms and conditions, her membership in the Firm could be terminated by the Executive Committee either for cause or not for cause. (*Id.* ¶ 47, Ex. 10.)

Since joining the Firm, Doe has received annual allocations from the Firm's profits. (Leccese Decl. ¶ 48.) For the balance of the Firm's 2013 fiscal year (*i.e.*, through October 31), Doe's allocation was in accordance with the individual agreement she entered into with the Firm. Specifically, Doe received a pro rata portion of $███████, which was comprised of pro rata portions of $███████ and a $███████ signing bonus. (*Id.*; Ex. 10 at 1.) After 2013, her annual partner allocations were determined in accordance with the Executive Committee's allocation process as described above. (Leccese Decl. ¶ 48.)

For 2014, Doe's profit allocation of $███████, represented a ██% increase over the allocation she received for 2013, while the average increase for full-year equity partners was approximately only ██%. (*Id.* ¶ 49.) For 2015, Doe's allocation of $███████ represented a ██% increase over 2014 as compared to the average increase for full-year equity partners of approximately only ██%, and it resulted in her being one of the six highest paid partners in the ███████████ Department, of whom three are male and three are female. (*Id.*)

In 2016, Doe's allocation was increased to $███████, an ██% increase over 2015 which, again, exceeded the average increase for full-year equity partners of approximately ██% and which resulted in Doe being the fifth highest paid partner in the ███████████ Department. (*Id.* ¶ 50.)

Throughout her tenure with the Firm, Doe's allocation has been reported on an IRS Schedule K-1, which shows her residence in ███████. (*Id.* ¶ 55.)

## ARGUMENT

### I.   AS AN OWNER OF THE FIRM, PLAINTIFF IS NOT COVERED BY THE EMPLOYMENT STATUTES UNDER WHICH SHE SEEKS TO RECOVER

The Supreme Court confirmed more than a decade ago that an individual who owns and manages a business is not an employee covered by employment discrimination statutes. *Clackamas*, 538 U.S. at 450. The rule is no different when an owner is a professional who provides services in the ordinary course of business, or when ownership is shared among multiple owners; such an owner is an employer, not an employee. *Id.* at 450-51. That sound principle has been extended to numerous federal and state employment statutes. It has been found to bar claims by lawyers, doctors and other professionals across the country who have attempted to sue their co-owners under the guise that they are employees.

The same principle bars Plaintiff's statutory claims here. Plaintiff endeavors to plead claims under: (i) the federal Fair Labor Standards Act (FLSA), as amended by the Equal Pay Act (EPA) (Compl. ¶¶ 59-71); (ii) the federal Family and Medical Leave Act (FMLA) (Compl. ¶¶ 72-78); (iii) the Washington D.C. Human Rights Act ("DCHRA") (Compl. ¶¶ 79-90); (iv) the Washington D.C. Family and Medical Leave Act ("DCFMLA") (Compl. ¶¶ 91-97); and (v) the Maryland Equal Pay for Equal Work Act ("MEPA") (Compl. ¶¶ 98-117).

However, as shown below, each of these statutes applies only to an "employee" or an individual employed by an "employer."[7] Plaintiff is neither.

---

[7] 29 U.S.C § 206(d); 29 U.S.C § 203(e)(1); 29 U.S.C. § 2611(2)(A); 29 U.S.C. § 2611(3); D.C. Code § 2-1402.11(a)(1); D.C. Code § 32-501(1); Md. Code, Lab. & Empl., § 3-307(a).

### A. **Applicable Standards**

Summary judgment is appropriate under Federal Rule of Civil Procedure ("Rule") 56 where there is no genuine issue as to a fact that might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 247-50 (1986). Here, the Firm is entitled to summary judgment on Plaintiff's statutory claims because, based on the undisputed facts, the laws governing those claims do not apply to her.

The "common-law element of control" serves as the "principal guidepost" for determining whether a business owner is an employer to whom employment discrimination statutes do not apply, as opposed to an employee, who has rights under those statutes. *Clackamas*, 538 U.S. at 448. Six non-exclusive factors inform that determination:

> (1) Whether the organization can hire or fire the individual or set the rules and regulations of the individual's work;
>
> (2) Whether and, if so, to what extent the organization supervises the individual's work;
>
> (3) Whether the individual reports to someone higher in the organization;
>
> (4) Whether and, if so, to what extent the individual is able to influence the organization;
>
> (5) Whether the parties intended that the individual be an employee, as expressed in written agreements or contracts; and
>
> (6) Whether the individual shares in the profits, losses, and liabilities of the organization.

*Id.* at 449-50. No one factor is decisive, and a court should consider "all of the incidents of the relationship." *Id.* at 451 (quotation omitted).

The *Clackamas* principles apply to each of the five statutes on which Plaintiff premises her claims.[8]  First, the FLSA, including the provisions added by the EPA, applies only to "employees." 29 U.S.C § 206(d).[9]  In fact, the FLSA's definition of "employee" – as an "individual employed by an employer" – is substantially the same as the definition of employee in the Americans with Disabilities Act ("ADA") that was interpreted by the Supreme Court in *Clackamas.*  29 U.S.C § 203(e)(1); *cf. Clackamas*, 538 U.S. at 444.  The courts have relied on *Clackamas* to guide them in evaluating FLSA claims and in dismissing those claims when they are advanced by business owners masquerading as employees.  *See, e.g., Escobar v. GCI Media, Inc.*, No. 08-21956-CIV, 2009 WL 1758712, at *6 (S.D. Fla. June 22, 2009) (granting summary judgment on FLSA claim because "as with any partner, [plaintiff] shared in the profits of the company, assumed the risks of loss and liabilities, had some right to share in management, and even contributed capital . . . ."); *see also Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322-23 (1992) ("[W]hen Congress has used the term 'employee' without defining it, we have concluded that Congress intended to describe the conventional master-servant relationship as understood by common-law agency doctrine.").

Second, the FMLA applies only to an "eligible employee," 29 U.S.C. § 2611(2)(A), and the FMLA incorporates the FLSA's definition of "employee." 29 U.S.C. § 2611(3).  Thus, the courts have relied on *Clackamas* when distinguishing business owners from employees for

---

[8] Plaintiff has publicly stated that she intends to amend her Complaint to assert a claim under Title VII (Doc. No. 7-1 at 1 n.1), but that claim would fail for the same reasons as her other statutory claims.  *See Solon v. Kaplan*, 398 F.3d 629, 632 (7th Cir. 2005); *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, No. 06CV1495, 2009 WL 3602008, at *5-7 (W.D. Pa. Oct. 28, 2009), *aff'd*, No. 09-4498, 2010 WL 2780927 (3d Cir. July 15, 2010).

[9] Indeed, the EEOC Guidance adopted by the Court in *Clackamas* was guidance that the EEOC "applies across the board to other federal antidiscrimination statutes," including the EPA.  538 U.S. at 449 n.7.

purposes of the FMLA. *See, e.g., Coldiron v. Clossman Catering, LLC*, No. 1:14-CV-300, 2015

WL 9583387 (S.D. Ohio Oct. 27), *report & recommendation adopted*, No. 1:14CV300, 2015

WL 9489789 (S.D. Ohio Dec. 30, 2015); *see also Zang v. W. Pa. Teamsters*, No. CV 14-1651,

2016 WL 1043188 (W.D. Pa. Mar. 16, 2016).

Third, the DCHRA, in pertinent part, applies only to compensation for employment or an

individual's "status as an employee." D.C. Code § 2-1402.11(a)(1). Because the DCHRA

substantially borrows its definition of "employee" from federal law,[10] courts have interpreted the

DCHRA's definition of employee by looking to Title VII and other federal statutes. *See Evans v.

Wash. Ctr. for Internships & Acad. Seminars*, 587 F. Supp. 2d 148, 151 n.4 (D.D.C. 2008); *see

also Elhusseini v. Compass Grp. USA, Inc.*, 578 F. Supp. 2d 6, 11 n.4 (D.D.C. 2008) ("[I]t has

been uniformly held that when construing the DCHRA courts should look to precedent

construing Title VII."). Because application of the *Clackamas* factors determines whether an

individual is an employee for purposes of Title VII, *see, e.g., Kirleis*, 2009 WL 3602008, at *5-7,

the same should be true for purposes of the DCHRA.[11]

Fourth, the DCFMLA provides rights to an "employee," D.C. Code §§ 32-502, 32-503,

which it defines essentially as "any individual . . . employed by [an] employer." D.C. Code § 32-

501(1). Not only do courts look to the federal FMLA to interpret the DCFMLA, *see Wash.

Convention Ctr. Auth. v. Johnson*, 953 A.2d 1064, 1076 (D.C. 2008), but, consistent with

---

[10] *Cf.* D.C. Code § 2-1401.02(9) ("any individual employed by . . . an employer"); 42 U.S.C. §
2000e(f); 29 U.S.C. § 203(e)(1).

[11] As with the federal employment statutes at issue, an employment relationship under the
DCHRA incorporates the common-law element of control. *See Miles v. Howard Univ.*, 83 F.
Supp. 3d 105, 114 n.1, 119-20 (D.D.C. 2015) (granting summary judgment on DCHRA claims
and noting that among tests for determining existence of employer-employee relationship, "main
consideration for the Court is the extent to which the putative employer has the right to control
the means and manner of the worker's performance") (citation omitted).

*Clackamas*, the DCFMLA also incorporates the common-law element of control in setting the parameters of "employer." *See* 4 D.C.M.R. § 1602.1 (applying joint employer liability to entity with "control over the work or working conditions of the employee"); § 1602.5 (same, where entity has "authority or responsibility to hire and fire"); *see also Miles v. Howard Univ.*, 83 F. Supp. 3d, 119-20 (D.D.C. 2015), *aff'd*, 653 F. App'x 3 (D.C. Cir. 2016).

Fifth, MEPA provides rights only to an "employee" against an "employer." Md. Code, Lab. & Empl., § 3-307(a). Although it does not define "employee," the MEPA "was patterned after the Federal Equal Pay Act," *Gaskins v. Marshall Craft Assocs., Inc.*, 678 A.2d 615, 617 n.1 (Md. App. 1996), and "essentially mirrors its federal counterpart," such that "courts have applied the same analysis in reviewing MEPA and EPA claims." *Glunt v. GES Exposition Servs., Inc.*, 123 F. Supp. 2d 847, 861-62 (D. Md. 2000). In construing the term "employee" when used by the Maryland legislature in employment statutes, Maryland courts have relied, as did the Court in *Clackamas*, on the common-law element of control. *See Balt. Harbor Charters, Ltd. v. Ayd*, 780 A.2d 303 (Md. 2001) (interpreting undefined term "employee" in wage laws using principles of agency and *respondeat superior*, including right to control).

For these reasons, it is clear that a determination as to whether Plaintiff is entitled to pursue relief under the statutes she invokes depends upon an analysis of the *Clackamas* principles. The analysis below confirms that Plaintiff is not covered by any of these statutes.

### B. The Six *Clackamas* Factors Demonstrate That Plaintiff Is An Owner

Plaintiff is a business owner to whom the employment statutes she seeks to invoke do not apply. She was admitted to the Firm by a vote of the partners; she provides services to clients free from oversight and supervision by Firm management or her co-partners; she has substantial authority to influence the Firm by voting on Firm affairs and for Executive Committee members and the Firm Chair (and by serving in those positions); the Partnership Agreement – which

20

governs her relationship with the Firm – clearly evidences the parties' intent to treat Doe as a

partner and owner and not an employee; and she contributes capital to the Firm and shares in the

Firm's profits, losses and liabilities.  In short, Plaintiff's relationship with the Firm is that of a

partner and business owner, and the lack of any material fact dispute over her relationship with

the Firm is fatal to Doe's statutory claims.[12]

### 1. The Firm Did Not "Hire" Plaintiff, Cannot "Fire" Her, and Does Not Set Rules and Regulations Giving It Control Over Her Work

Under the Firm's Partnership Agreement, new partners may be admitted to the Firm only

upon the affirmative vote of 75% of the equity partners.  (Leccese Decl. ¶ 11; Ex. 1 §§ 6(a)(i), 9.)

Plaintiff was not "hired" by the Firm.  Rather, after a presentation to the equity partners at a

partnership meeting, the equity partners voted to admit Plaintiff as an equity partner.  (Leccese

Decl. ¶ 46.)  Likewise, Plaintiff cannot be "fired."  Rather, in her individual agreement Doe

agreed that her membership in the Firm could be terminated upon six months' notice (or less, for

cause) by the Executive Committee (*Id.* ¶ 47; Ex. 10  at 3) – a Committee that answers to the

partners and on which she is entitled to serve if elected, and comprised of partners for whom she

was entitled to vote to elect (Leccese Decl. ¶¶ 18-20; Ex. 1 §§ 5(b), 6(c), (e ), 7(c).)  These

attributes reflect business ownership and not employee status.  *See Weir v. Holland & Knight,*

*LLP,* 34 Misc. 3d 1207(A), 943 N.Y.S.2d 795 (Sup. Ct. N.Y. Cty. 2011) (summary judgment

granted where plaintiff could be expelled from the firm upon the vote of at least 70 percent of the

---

[12] As Justice Powell explained in cautioning against the application of Title VII to law firm partners, "[t]he relationship among law partners differs markedly from that between employer and employee—including that between the partnership and its associates. . . . The essence of the law partnership is the common conduct of a shared enterprise.  The relationship among law partners contemplates that decisions important to the partnership normally will be made by common agreement."  *Hishon v. King & Spalding,* 467 U.S. 69, 79-80 (1984) (J. Powell, concurring).  "Divisions of partnership profits . . . involve judgments as to each partner's contribution to the reputation and success of the firm."  *Id.* at 79 n.3.

firm's Directors Committee and plaintiff was eligible to elect the Committee and run for election to the Committee); *Cronkhite v. Unity Physician Group, P.C.*, No. 1:05-cv-1577-SEB, JMS, 2007 WL 1035091, at *2-3 (S.D. Ind. Mar. 30, 2007) (physician who was not a board member was not an employee where his agreement specified that he could be terminated by a vote of seventy-five percent of the board of directors); *Kirleis*, 2009 WL 3602008, at *17 (granting summary judgment to law firm where vote of three-fourths of eligible shareholders required to terminate plaintiff's ownership); *Bragg v. Orthopaedic Assocs. of Va.*, No. 2:06-cv-347, 2007 WL 702786, at *4 (E.D. Va. Mar. 2, 2007) (shareholder of professional corporation "was not merely someone who could be fired at the whim of a supervisor [and] had significant contractual protections against termination").

Similarly, the Firm does not set rules and regulations to control Plaintiff's work. Plaintiff generates client relationships and performs legal work for clients in her discretion subject to the general policies concerning conflicts, risk and billing established by the Firm's elected Executive Committee for the collective benefit of the partners and the Firm. (Leccese Decl. ¶ 51.) Indeed, the partners have, through the Partnership Agreement, delegated decisions on those matters to the Executive Committee, via its authority to "determin[e] [the] fees, profits, expenses, and accounting practices" of the Firm (*id.* ¶ 16; Ex. 1 § 5(c)(i)), and to make "determinations regarding acceptance of client representation and resolution of conflicts arising in the course of such representation" (Leccese Decl. ¶ 16; Ex. 1 § 5(c)(viii).)[13] None of these basic policies is the type of rule or regulation that indicates an employment relationship. *See, e.g., Rodal v.*

---

[13] To the extent Plaintiff disagrees with the Executive Committee's exercise of authority – or with the delegation of authority to the Committee in the first instance – Plaintiff may seek election to the Executive Committee (or the Firm Chair position), vote for Executive Committee candidates (or a Firm Chair candidate) she believes will implement her preferences, or request discussion at a partners' meeting, including on the subject of amending the Agreement.

*Anesthesia Group of Cent. N.Y.*, No. 00-CV-1386, 2006 WL 208835, at *3 (N.D.N.Y. Jan. 23, 2006) (contractual provisions about work assignments not indicative of employee status because doctor was "substantially independent in his own professional duties"); *Kirleis*, 2009 WL 3602008, at *21 (law firm did not exercise control over shareholder attorney despite policies requiring approval of new representations "for conflicts and financial viability"); *see also Miles*, 83 F. Supp. 3d at 115 (procedures through which defendant "monitored the plaintiff for quality control purposes" were "high-level personnel requirements" not consistent with common-law notion of control).

The facts that Plaintiff was not "hired," cannot be "fired," and is not subject to rules or regulations that control her work, make clear her status as a business owner/employer, not an employee.

### 2. None of Plaintiff's Co-Owners Supervises Her Work

Plaintiff is not supervised in a manner consistent with an employment relationship.   The Firm does not assign Plaintiff work, nor does it oversee the work she performs.  (Leccese Decl. ¶ 51.)  For example, Plaintiff routinely files court documents and advises clients both pre- and during litigation without oversight by the Executive Committee or any of her other co-owners. (*Id.*)  This level of discretion is inconsistent with the type of supervision that characterizes an employment relationship. *See Bluestein v. Cent. Wis. Anesthesiology, S.C.*, 769 F.3d 944, 954 (7th Cir. 2014) ("The salient point is that [plaintiff] could point to no supervisor…who dictated how [she] practiced anesthesiology.  As a physician, she determined how to complete the specific tasks of her work."); *Coleman v. New Orleans & Baton Rouge S.S. Pilots' Ass'n*, 437 F.3d 471, 481 (5th Cir. 2006) (pilot who "gives navigation advice independently according to his own professional judgment" not supervised within meaning of *Clackamas*); *Kirleis*, 2009 WL

3602008, at *20-21 (attorneys not "so closely supervised and their legal discretion so restricted .

. . that they may be considered to be 'employees'"); *Cronkhite*, 2007 WL 1035091, at *7-8

("[A]side from general promulgations of policy, [plaintiff] bore 'full responsibility' for his own

patient care and [defendant] would not 'direct, supervise, or control' such care."). No employee

of the Firm has this unfettered discretion. The Firm's associates and other staff are subject to

supervision, including by Plaintiff herself who oversees client matters. (Leccese Decl. ¶ 53.)

Unlike a Firm employee, Plaintiff sets her own priorities and schedule, determining, for

example, whether and when she will spend her time pursuing business from existing clients or

prospective clients, and when she will perform the legal work for which she is retained by those

clients. (*Id.* ¶ 52.) Indeed, although Doe asserts an FMLA claim, she never requested "leave"

because like all equity partners she comes and goes as she sees fit, provided that she meets her

professional responsibilities to clients. (*Id.* ¶ 54.) She took what time she needed for her health

and welfare without seeking permission from anyone. (*Id.*) Plaintiff's ability to dictate her

priorities and execute them as she sees fit is a prerogative enjoyed by an owner – not an

employee. *See Kirleis*, 2009 WL 3602008, at *21 ("Plaintiff also set her own hours and work

schedule, within the minimum and maximum billing hours adopted by the Board of Directors,

could work from home, and could work on weekends or not."); *Bragg*, 2007 WL 702786, at *4

(plaintiff's "broad discretion to set her work hours and choose the office locations at which she

would work" and to "set her own vacations and other time away from work" inconsistent with

employee status).

In sum, Plaintiff's ability to function – and the expectation that she will function –

without supervision makes clear that she is an owner of the Firm, not one of its employees.

### 3.   Plaintiff Does Not Report to Any of Her Co-Owners

Plaintiff's assent to the Partnership Agreement's delegation of certain aspects of Firm management to the Executive Committee does not convert Plaintiff into an employee who "reports" to the Committee. *See Bluestein*, 769 F.3d at 954; *Kirleis*, 2009 WL 3602008, at *21; *Cronkhite*, 2007 WL 1035091, at *7-8.  In *Bluestein*, for example, the plaintiff claimed that a "committee of which she was not a member determined doctors' schedules and patient assignments." *Bluestein*, 769 F.3d at 954.  But the Seventh Circuit found this contention to be "irrelevant" because plaintiff "had an equal vote in the delegation" and doctors were "free to delegate authority to one of their members and just as free to retract that delegation." *Id.*  And, according to the Court, that plaintiff "was in the minority view" did "not detract from her right of control." *Id.*  The same is true here, where any authority the Executive Committee wields "derives from and is delegated by the partners" (Leccese Decl. ¶ 14; Ex. 1 § 5(a)), and Plaintiff has the same rights as every other equity partner to vote for Committee members and Firm Chair, and to serve in those positions herself.  (Leccese Decl. ¶¶ 19-20; Ex. 1 §§ 5(b), 6(c), (e ), 7(c).)

Finally, it deserves note that Plaintiff has Firm employees reporting to her.  Among other things, Plaintiff heads the Firm's ███████████████████ Group and co-heads the Firm's ███████████████ practice group.  (*Id.* ¶ 53.)  These facts, too, contradict Plaintiff's contention that she is an employee.  *See Bragg*, 2007 WL 702786, at *4 (finding plaintiff not employee where she "directed the work of non-physician employees" and "was in charge of [defendant's] physical therapy practice").

### 4. Plaintiff Has the Ability to Influence the Firm, Including by Voting on Firm Affairs, Serving on the Executive Committee or as Firm Chair, or Electing Her Co-Owners to Serve on Her Behalf

As an equity partner, Plaintiff has substantial voting rights and thus has the ability to influence the Firm. (Leccese Decl. ¶ 10-12; Ex. 1 § 6(a)-(e).) A host of actions require approval by a vote of the Firm's partners. These include all the actions described in pages 5 and 6 above. *Supra* at 5-6. In addition, a vote by the partners is required not only with respect to any matter that at least three Executive Committee members "deem of sufficient importance to merit discussion or decision by the partners" (Leccese Decl. ¶ 18; Ex. 1 § 5(c)), but also with respect to *any* matter on which 25% of the partners request a partnership vote (*Id.*, Ex. 1 § 5(e)).

Plaintiff's ability to influence the Firm through her vote on these important partnership matters reinforces her status as a business owner and not an employee. *See Bluestein*, 769 F.3d at 954 (describing influence as "opportunity for shared control" through voting); *Mariotti v. Mariotti Bldg. Prods.*, 714 F.3d 761, 768 (3d Cir. 2013) (finding "ability to participate in the fundamental decisions of the business" inconsistent with employee status); *Solon*, 398, F.3d at 634 ("[B]y virtue of [plaintiff's] voting rights, [he] substantially controlled the direction of the firm . . . ."). And Plaintiff's input on these matters through her vote is the same as that of any other equity partner in the Firm. (Leccese Decl. ¶ 10; Ex. 1 § 6(e).)

Because Plaintiff has the ability to participate in the decisions made by the Firm, the fact that other equity partners are afforded the same level of input or that Plaintiff may be outvoted by those who hold differing views, does not transform Plaintiff from a partner/owner/employer into an employee. *See Solon*, 398 F.3d 629 at 634 ("Nor does [Plaintiff's] contention that he was outvoted undermine the conclusion that he was an employer."); *Marshall v. GE Marshall, Inc.*, No. 2:09-cv-198 APR, 2014 WL 1414864, at *8 (N.D. Ind. Apr. 14, 2014) ("Although an

employer's preferences may not always be followed in cases where a business is jointly owned, this does not strip the individual from her designation as an employer."); *Bowers v. Ophthamology Grp., LLP*, No. 5:12–CV–00034–JHM, 2012 WL 3637529. at *6 (W.D. Ky. Aug. 22, 2012), *vacated on other grounds*, 733 F.3d 647 (6th Cir. 2013) ("[O]ne's status does not change from partner to employee simply because the partner is out-numbered and finds herself in a minority position among the other partners.").

Likewise, the fact that the Firm's equity partners have delegated specified authority to the Executive Committee to manage the operations of the Firm does not relegate Plaintiff to the role of an employee. To the contrary, the delegation of authority to a managing committee, "[a]t most . . . reflects the economic and political realities of the practice of law and divisions of labor at a large law firm." *Kirleis*, 2009 WL 3602008, at *22. Indeed, here, Plaintiff and the Firm's equity partners elect the members of the Committee and the Firm's Chair. *See Coleman*, 437 F.3d at 481 (finding pilot "exert[s] substantial influence" over pilots' association by "hold[ing] an equal share and participat[ing] in the election of directors of the association and in shareholder-approval votes"); *Weir*, 34 Misc. 3d 1207(A), at *6 (noting plaintiff's influence as part of the "only category of partners who have the right to elect the Managing Partner"). Doe may also seek election to the Executive Committee or to the position of Firm Chair. *See Bluestein*, 769 F.3d at 953 ("[U]nder the bylaws, any physician-shareholder who could secure the support of a sufficient number of board members could challenge and change those policies."); *Kirleis*, 2009 WL 3602008, at *22 ("Perhaps most important, plaintiff was eligible to be elected to the Executive Committee by her fellow Class A Shareholder/Directors . . . ."). And, if Doe disagrees with the delegation of authority to the Executive Committee, she has the authority to

27

influence the scope of that delegation by seeking to amend the Partnership Agreement.[14] (Leccese Decl. ¶ 11; Ex. 1 §§ 5(e), 6(a)(v).)

Plaintiff also has complete information about other equity partners' allocations, and access to comprehensive financial information about the Firm's performance and substantial information regarding other equity partners' contributions. (Leccese Decl. ¶¶ 38, 44-45, 56.) This access underscores Plaintiff's status as an owner, not an employee; the Firm's income partners and employees do not have comparable access. (*Id.* ¶ 45.) *See Kirleis*, 2009 WL 3602008, at \*18; *Solon*, 398 F.3d at 633 (relying on plaintiff's access to "private financial information" in determining that plaintiff was not an employee).

If Plaintiff disagrees with the Executive Committee's exercise of its delegated authority, she has ample recourse under the Partnership Agreement. What Plaintiff cannot do is sue the Firm under the pretense that she is an employee.

### 5. The Firm's Partnership Agreement Evidences an Intent that Plaintiff Be an Owner/Employer, Not an Employee

As a party to the Partnership Agreement, Plaintiff has rights and obligations that clearly reflect her status as an owner/employer, rather than an employee. Among other things, she

---

[14] Plaintiff's substantial ability to influence the Firm stands in sharp contrast to the circumstances addressed by the Seventh Circuit in *EEOC v. Sidley Austin Brown & Wood*, 315 F.3d 696 (7th Cir. 2002). In *Sidley*, the EEOC sought to enforce a subpoena in connection with an investigation into whether the Sidley firm violated the ADEA when it demoted 32 of its equity partners to counsel or senior counsel. Although the Court found the firm was "controlled by a self-perpetuating executive committee," the members of which were elected by the committee itself and not the partners (*id.* at 699, 702-03), that the partners had "no control, direct or indirect, over [the committee's] composition" (*id.* at 703), and that there had only been one firm wide issue on which the partners had voted in the preceding 25 years (*id.* at 699), it explicitly refrained from ruling that the demoted partners were employees within the meaning of the ADEA (*id.* at 707), noting that the issue was a "murky" one and the Firm had "respectable arguments on its side." (*Id.* at 707.)

shares in the profits and losses of the Firm (Leccese Decl. ¶ 23, Ex. 1 § 11), makes capital

contributions (and bears the risk of loss of her capital) (*Id.*, Ex. 1 § 12(a)-(b)), and votes on the

array of significant matters described above (*Id.*, ¶ 11, Ex. 1 § 6). *See Bluestein*, 769 F.3d at

955-56 (rejecting employee status in light of shared voting authority, even where plaintiff's

agreement labeled her "employee"); *Kirleis*, 2009 WL 3602008, at *23.

  Also consistent with Plaintiff's ownership status, the Firm reports her allocation of profits

and losses and distributions from the Firm to the IRS on a Schedule K-1 (used to report partner

income), not a Form W-2 (used to report employee wages). (Leccese Decl. ¶ 55.) *See Bowers*,

2012 WL 3637529, at *5 (finding significant the "use[] [of] a schedule K-1 form in reporting

income, losses and dividends"). Similarly, partners report to the IRS annually that they are self-

employed business owners, and thus not employees of the Firm. (Leccese Decl. ¶ 40.)

### 6. As an Owner of the Firm, Plaintiff Shares in the Firm's Profits, Losses and Liabilities

  The Partnership Agreement specifically requires that "[t]he profits of the Firm each year

shall be allocated among the partners" (Leccese Decl. ¶ 24, Ex. 1 § 11), and there can be no

dispute that Plaintiff has received a share of the Firm's profits every year since she joined the

Firm. (Leccese Decl. ¶¶ 48-50.) As already demonstrated, Plaintiff's allocations rose steadily

during her years at the Firm, and she was one of the highest paid partners in the ████████

████████ Department. (*Id.*) Plaintiff's regular receipt of partnership profits undermines any

allegation that she is an employee. *See, e.g., Bluestein* 769 F.3d at 955; *Kirleis*, 2009 WL

3602008, at *25; *Bragg*, 2007 WL 702786, at *5; *Cronkhite*, 2007 WL 1035091, at *10.

  The equity partners' agreement to delegate the task of allocating profits to certain

partners does not change the fundamental nature of Plaintiff's relationship with the Firm. *See*

*Kirleis*, 2009 WL 3602008, at *18 ("Although it is an important subject, the fact that

[compensation of attorney shareholders] is delegated exclusively to the Executive Committee does not mean that everyone else affected by this delegation of authority . . . is an employee."). Indeed, the transparency of the Committee's process when allocating the Firm's profits reflects the common understanding that those profits are being allocated among owners, not employees. (Leccese Decl. ¶¶ 25-38); *cf. Kirleis*, 2009 WL 3602008, at *18 (plaintiff/ attorney was not employee even where only the executive committee had access to information about shareholders' allocation of profits).

Plaintiff, like all equity partners, also shares in the Firm's losses and liabilities. She contributes capital to the Firm in an amount equal to 7% of her allocated profits. (Leccese Decl. ¶ 23, Ex. 1 § 12(a).)  Although Plaintiff receives a yearly return on her invested capital at a rate fixed by the Committee (*Id.*, Ex. 1 § 12(b)), she bears an owner's risk of the loss of her capital. The Partnership Agreement specifies that "net losses shall be chargeable to the partners" up to the amount of their capital accounts. (*Id.* § 11.)  Employees of the Firm, of course, do not make capital contributions and are not charged with any portion of the Firm's losses (*Id.* ¶ 24), as these features of ownership are inconsistent with the status of an employee. *See Ziegler v. Anesthesia Assocs. of Lancaster, Ltd.*, 74 F. App'x 197, 200 (3d Cir. 2003) (finding capital contributions indicative of employer status); *Kirleis*, 2009 WL 3602008, at *26 (concluding that capital contributions "weigh[] heavily" in favor of employer status).

For the reasons explained above, the Court should conclude that Doe is *not* an "employee" entitled to bring suit under the statutes relied upon in Counts I through VIII of the Complaint, and those Counts should be dismissed with prejudice.

## II.   PLAINTIFF IS NOT COVERED BY THE MARYLAND EQUAL PAY FOR EQUAL WORK ACT

Counts VII and VIII of the Complaint should be dismissed not only because Plaintiff is not an employee under MEPA, but because the statute does not apply extraterritorially to individuals—such as Plaintiff—who do not live in Maryland.

In Maryland, "unless an intent to the contrary is expressly stated, acts of the legislature will be presumed not to have any extraterritorial effect." *Chairman of Bd. of Trustees of Emp. Ret. Sys. v. Waldron*, 285 Md. 175, 183–84, 401 A.2d 172, 177 (1979). *See also Elyazidi v. SunTrust Bank*, 13-cv-2204, 2014 WL 824129, at *8 (D. Md. Feb. 28, 2014), *aff'd*, 780 F.3d 227 (4th Cir. 2015) ("Maryland courts have … recognized that, 'as a general rule, one State cannot regulate activity occurring in another State, and that, in deference to that principle, regulatory statutes are generally construed as not having extra-territorial effect unless a contrary legislative intent is expressly stated.'") (citing *Consumer Prot. Div. v. Outdoor World Corp.*, 91 Md. App. 275, 287, 603 A.2d 1376, 1382 (1992)).

MEPA contains no such express legislative intent.  The statute provides only that "[a]n *employer* may not discriminate" based on gender in paying wages.  *See* Md. Code Ann., Lab. & Empl. § 3-304(b)(1) (emphasis added).  The term "employer" is defined as: "a person engaged in a business, industry, profession, trade, or other enterprise *in the State*."  *See* Md. Code Ann., Lab. & Empl. § 3-301(b)(1) (emphasis added).[15]  Nowhere in MEPA is there any indication that the legislature intended the statute to have extraterritorial effect.  To the contrary, the notes to the

---

[15] The Maryland legislature has expressly provided for extraterritorial application of other state statutes. *See* Md. Code Ann., Lab. & Empl. § 9-203 (providing for extraterritorial application of Maryland's Worker's Compensation Act under certain circumstances).  Thus, the omission of a similar provision from MEPA must have been intentional. *See Blackman v. Lincoln Nat'l Corp.*, 10-cv-6946, 2012 WL 6151732, at *4 n.7 (E.D. Pa. Dec. 10, 2012) (provision in Worker's Compensation Act explicitly providing for extraterritorial application shows that omission of similar language in Human Rights Act was intentional).

1991 amendments to MEPA made clear that certain amendments to the statute were enacted

because "[t]he Department was concerned that *Maryland citizens* might [otherwise] lose equal

pay protection ... ." 1991 Maryland Laws Ch. 8 at 303 (emphasis added). This legislative

history suggests that MEPA was intended to protect Maryland citizens only, and not those—like

Plaintiff—who live outside of the state.[16]

In an effort to inject Maryland law into this dispute, Plaintiff alleges that she is a member

of the Maryland bar and that she performed work in Maryland for Maryland clients. (Compl. ¶¶

10, 14.) However, these allegations, even if true, are insufficient to bring Plaintiff within

MEPA's protection. MEPA provides that an employer may not discriminate in the payment of

wages. Plaintiff does not allege that she received her share of the Firm's profits in Maryland, or

that any decisions relating to her allocations were made in Maryland. In other words, Plaintiff

does not even assert facts sufficient to show that Proskauer's allegedly discriminatory conduct

(*i.e.*, her purported receipt of less pay than similarly situated men), occurred in or even had an

impact in Maryland.[17] *See, e.g., Hoffman*, 933 N.E.2d at 748 (plaintiff's attendance at quarterly

---

[16] Plaintiff does not plead that she resides in Maryland, and Proskauer does not maintain an office in Maryland. (Leccese Decl. ¶ 7.) Moreover, Plaintiff's K-1 shows her residence to be in ▉▉▉▉. (*Id.* ¶ 55.)

[17] Although Maryland courts have not yet expressly opined on the extraterritorial application of MEPA, courts in other jurisdictions faced with this issue have rejected the extraterritorial application of similar state anti-discrimination laws. *See, e.g., Thomas v. Sotera Defense Solutions, Inc.*, 40 F. Supp. 3d 181, 185 (D.D.C. 2014) (Jackson, J.) (dismissing DCHRA claim for lack of subject matter jurisdiction  pursuant to Rule 12(b)(1) where plaintiff did not assert that any discriminatory decisions were made in D.C. or that plaintiff "applied for and was denied a position located in the District"); *Murphy v. PricewaterhouseCoopers, LLP*, 813 F. Supp. 2d 45, 54 (D.D.C. 2011) (dismissing New York State and City discrimination claims after finding that "Plaintiffs have not provided any evidence of discriminatory impact in New York."); *see also Blackman*, 2012 WL 6151732, at *4 ("Since the [Pennsylvania Human Rights Act] is silent as to whether it applies to individuals that neither work nor reside in Pennsylvania, the presumption is that the PHRA does not have extraterritorial reach."); *Albert v. DRS Techs., Inc.*, 10-cv-03886, 2011 WL 2036965, at *2 (D.N.J. May 23, 2011) (dismissing NJLAD claim of Florida resident working at Florida office of New Jersey company); *Hoffman v. Parade Publ'ns*,

meetings in New York were not sufficient to show impact in the state under the New York City

and New York State Human Rights Laws); *Blackman*, 2012 WL 6151732, at *7 ("Plaintiff's

attendance at quarterly meetings at Defendant's Pennsylvania office and daily interactions with

employees located in Pennsylvania are also not sufficient to justify extending the reach of the

PHRA to a nonresident not working in Pennsylvania.").

### III.     DOE'S COMMON LAW CLAIMS SHOULD BE DISMISSED

At bottom, this lawsuit is a compensation dispute that is governed by the express terms of

the Partnership Agreement to which Doe agreed.  That Agreement governs how profits are

allocated and distributed to partners, including Doe; and under the plain terms of the Agreement,

there has been no breach.  There can be no dispute that the authority to set partner allocations is

delegated to the Executive Committee and no dispute that the Executive Committee distributed a

share of the profits to Doe in each year she has been a partner.  Because Doe takes issue with her

allocation of the Firm's profits (and likely because she realizes there has been no breach of the

Partnership Agreement), she attempts to frame her dispute under several different common law

---

15 N.Y.3d 285, 291, 933 N.E.2d 744 (2010) (plaintiff claiming violation of New York State or
New York City anti-discrimination laws "must plead and prove that the alleged discriminatory
conduct had an impact in New York."); *E.E.O.C. v. CRST Van Expedited, Inc.*, No. 07-cv-95,
2009 WL 1586193, at *19 (N.D. Iowa June 2, 2009), *aff'd*, 670 F.3d 897 (8th Cir. 2012),
*withdrawn from bound volume, opinion vacated on other grounds & superseded on reh'g*, 679
F.3d 657 (8th Cir.), *and aff'd*, 679 F.3d 657 (8th Cir. 2012) (construing the Iowa Civil Rights
Act "against the backdrop of the non-extraterritoriality principle of statutory construction");
*Judkins v. St. Joseph's Coll. of Me.*, 483 F. Supp .2d 60, 65 (D. Me. 2007) (applying the "well-
established presumption against extraterritorial application of a state's statutes" to interpretation
of the Maine Human Rights Act); *Arnold v. Cargill, Inc.*, No. 01-cv-2086, 2002 WL 1576141, at
*2 (D. Minn. July 15, 2002) (noting that the "presumption against the extra-territorial application
of a state's statutes ... serves to avoid running afoul of the Commerce Clause of the United States
Constitution") (internal quotation marks omitted); *Union Underwear Co. v. Barnhart*, 50 S.W.3d
188, 190 (Ky. 2001) ("[U]nless a contrary intent appears within the language of [the Kentucky
Civil Rights Act], we presume that the statute is meant to apply only within the territorial
boundaries of the Commonwealth.").

theories.  Yet, she cannot maintain any of those derivative claims because each one of them –

breach of fiduciary duty, unjust enrichment, and fraudulent misrepresentation – are based on the

same facts that underlie Doe's claim for additional profits under the Partnership Agreement.  In

other words, Doe cannot repackage the same dispute in the hopes of obtaining multiple

opportunities to litigate the same claim.  For this reason and the other independently sufficient

reasons set forth herein, each of Doe's common law claims should be dismissed as a matter of

law under Rule 12(b)(6).[18]

### A.   Doe's Common Law Claims Are Governed By New York Law

The Partnership Agreement and any dispute arising thereunder are governed by New

York law.  (Ex. 1 § 23.)  Courts in this Circuit give effect to contractual choice-of-law-provisions

provided that there is a "reasonable relationship" with the chosen state.  *Chambers v. NASA*

*Federal Credit Union*, -- F. Supp. 3d --, 2016 WL 6155930, at *3 (D.D.C. 2016).  Because the

Firm is a New York limited liability partnership (Leccese Decl. ¶ 6) with its principal office in

New York (Compl. ¶ 11; Leccese Dec. ¶ 7, Ex. 1 § 4), the choice of law provision is reasonable.

*See Chambers*, 2016 WL 6155930, at *3 (applying Maryland choice-of-law provision contained

in agreement to breach of contract and associated claim because the defendant had company

branches in Maryland); *Murphy v. LivingSocial, Inc.*, 931 F. Supp. 2d 21, 25 (D.D.C. 2013)

(applying choice of law provision in agreement, which specified law of the jurisdiction in which

---

[18] The Firm's reliance on the Partnership Agreement does not convert Section III of the motion into a motion for summary judgment under Rule 56.  The Partnership Agreement is integral to Doe's Complaint and is specifically referenced and incorporated therein.  *See* Compl. ¶¶ 27, 126, 127; *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1133 (D.C. Cir. 2015) ("A district court may consider a document that a complaint specifically references without converting the motion into one for summary judgment.") (internal quotation marks and citations omitted); *Billups v. Lab. Corp. of Am.*, No. CV 16-1502 (RJL), 2017 WL 435723, at *1 n.1 (D.D.C. Jan. 30, 2017) (relying on a document produced by defendant without converting into a motion for summary judgment because plaintiff quoted from the document and relied on the document).

the defendant's company was headquartered).  As a sophisticated ████ lawyer, Doe is

perfectly capable of understanding the import of a choice-of-law provision in her own

Partnership Agreement.  Accordingly, the Court should apply New York law to all of Doe's

common law claims, as those claims all hinge on the Agreement.  *See Fuentes-Fernandez &*

*Company, PSC v. Corvus Group, Inc.*, 174 F. Supp. 3d 378, 386-87 (D.D.C. 2016) (Jackson, J.)

(enforcing choice-of-law provision in contract and applying it to breach of contract, breach of

fiduciary duty, and fraudulent misrepresentation claims); *Murphy*, 931 F. Supp. 2d at 25

(applying choice-of-law provision in employment agreement to libel claim that was "inextricably

intertwined with, and aris[ing] out of, plaintiff's employment with [defendant]").

### B.   Doe Fails to State A Breach of Contract Claim

Doe's breach of contract claim should be dismissed because she cannot demonstrate that

the Firm breached its contractual obligations to her under the Partnership Agreement.  To state a

breach of contract claim, Doe must show:  (1) the existence of a contract; (2) her adequate

performance under the contract; (3) that the Firm breached the contract; and (4) that she suffered

damages.  *Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011).

Because Doe accepted the Partnership Agreement, which expressly delegates non-

reviewable authority to the Executive Committee to allocate and distribute the Firm's profits

among the partners, she cannot establish a breach of that Agreement based on her disagreement

with the allocation she received.  *See LoFrisco v. Winston & Strawn LLP*, 10 Misc. 3d 1066(A)

(Sup. Ct., N.Y. Cty. 2005) (granting summary judgment on contract claim between a partner and

his law firm where that executive committee retained discretion in making compensation

decisions).  *See also Phansalkar v. Andersen Weinroth & Co., L.P.*, No. 00 CIV. 7872 (SAS),

2002 WL 1402297 (S.D.N.Y. June 26, 2002), *aff'd in part, vacated in part*, 344 F.3d 184 (2d

Cir. 2003) (dismissing breach of contract claim where plaintiff's partner allocations were subject to the discretion of the defendants); *Roan v. Keck, Mahin & Cate*, 962 F.2d 10 (7th Cir. 1992) (dismissing breach of contract/implied covenant claim where partnership agreement conferred discretion on law firm management to make compensation decisions).

Doe does not allege—nor can she allege—that the Firm did not allocate and distribute to her a share of the profits in each year in which she was partner, in accordance with the terms of the Agreement. Rather, Doe takes issue with the amount of profits that the Firm distributed to her. But the Agreement does not prescribe that Doe would be allocated any particular amount of the Firm's profits (Leccese Decl. ¶¶ 23-24, Ex. 1 § 11) – only that she receive annual allocations —which she indisputably did (and very sizeable allocations at that). The amounts of those annual distributions are determined by the Executive Committee by the express terms of the Agreement (*Id.* ¶ 16, Ex. 1 § 5(c)(ii), and thus Doe cannot sustain a breach of contract claim.

Moreover, through the Partnership Agreement, Doe also agreed that matters determined by the Executive Committee, including allocation and distribution of the Firm's profits, "shall be final and binding for purposes of [the Partnership] Agreement and not subject to review or modification in any arbitration or judicial proceeding." (*Id.* ¶ 15, Ex. 1 § 22.) Not only did the Firm not breach its Agreement with Doe, but Doe expressly relinquished the right to sue the Firm for such allocation-related decisions. As an owner in the Firm, she delegated that decision-making authority to duly elected members of the Committee. (*Id.* ¶ 14, Ex. 1 § 5.) The New York Court of Appeals has held that "where the parties have established a procedure for resolution of their intra-partnership…disputes, as here, that procedure should be … adhered to[.]" *Opan Realty Corp. v. Pedrone*, 36 N.Y.2d 943, 944 (1975). Under the clear terms of the Agreement, therefore, Doe is foreclosed from litigating this alleged allocation dispute.

Finally, Plaintiff styles Count X of the Complaint as alleging a claim for "Breach of Contract/Breach of the Implied Covenant of Good Faith and Fair Dealing." It is well settled, however, that the implied covenant of good faith and fair dealing that exists in every contract does not create new or additional rights, or provide a plaintiff with an independent basis for recovery. *See Vill. on Canon v. Bankers Trust Co.*, 920 F. Supp. 520, 534 (S.D.N.Y. 1996). Thus, Plaintiff cannot seek to inject into the Partnership Agreement anti-discrimination/anti-retaliation protections that are statutorily conferred on employees under the guise of a breach of the implied covenant of good faith and fair dealing. Indeed, as Plaintiff appears to acknowledge by framing Count X as a single claim, any claim for a breach of the implied covenant is duplicative of the breach of contract claim. *See Atlantis Info. Tech. v. CA, Inc.*, 485 F. Supp. 2d 224, 230 (E.D.N.Y. 2007) ("Parties to an express contract are bound by an implied duty of good faith, but breach of that duty is merely a breach of the underlying contract."); *Habitzreuther v. Cornell Univ.*, No. 5:14-cv-1229 (GLS/TWD), 2015 WL 5023719, at *6 (N.D.N.Y. Aug. 25, 2015) ("New York law does not recognize…a separate cause of action for breach of the implied covenant of good faith and fair dealing.").

**C.      Doe Fails to State a Claim for Breach of Fiduciary Duty**

**1.   The Fiduciary Duty Claim is Duplicative of the Contract Claim**

Doe's breach of fiduciary duty claim likewise fails. As a threshold matter, the claim is duplicative of Doe's contract claim and should be dismissed on that basis alone. *See William Kaufman Organization, Ltd. v. Graham & James L.L.P.*, 269 A.D.2d 171, 173 (1st Dep't 2000) ("A cause of action for breach of fiduciary duty which is merely duplicative of a breach of contract claim cannot stand.").

Doe further claims that the Firm breached its fiduciary duty to her by failing to "treat her

37

equitably" (Compl. ¶ 121)—*i.e.* by allegedly failing to provide her allocations she claims she

would have received *under the terms of the Partnership Agreement* absent purported

discrimination and/or retaliation (*id.* ¶¶ 30, 119).[19]   Such a claim is not "separate and distinct"

from her breach of contract claim because Doe is seeking the same damages based on the same

set of alleged facts.  *See William Kaufman Org.*, 269 A.D.2d at 173.   Courts routinely dismiss

fiduciary duty claims in similar circumstances.  *See, e.g.*, *Atlantis Info. Tech.*, 485 F. Supp. 2d at

231-32 (noting that even if a fiduciary relationship existed between the parties, the court would

have granted the motion to dismiss the claim because it was based on the same allegations as was

the claim for breach of contract; the plaintiff alleged that the defendant breached its fiduciary

duty by failing to pay royalties and failing to provide accurate reports, which were the same

allegations made in support of the plaintiff's breach of contract claim); *Robin Bay Associates,*

*LLC v. Merrill Lynch & Co.*, 2008 WL 2275902, at *3-4 (S.D.N.Y. June 3, 2008) (dismissing

breach of fiduciary duty claim where there was almost "total overlap" between the allegations in

support of the breach of contract and fiduciary duty claims); *Chowaiki & Co. Fine Art v. Lacher,*

115 A.D.3d 600, 600, 982 N.Y.S.2d 474, 475 (2014) (finding that the trial court properly

dismissed plaintiffs' claim for breach of fiduciary duty as duplicative of the breach of contract

claim, since the claims were premised upon the same facts and sought identical damages).

### 2. Doe's Breach of Fiduciary Duty Claim Fails Because the Firm Performed in Accordance with the Partnership Agreement

Doe's breach of fiduciary duty claim also fails because the Partnership Agreement

committed to the Executive Committee the discretion to allocate profits. (Leccese Decl. ¶ 16,

---

[19] Doe's breach of fiduciary duty claim also undercuts her argument that she is an "employee" for purposes of federal and state anti-discrimination laws.  Doe cannot claim she is an "employee" for purposes of her statutory discrimination claims, and a partner who was owed a fiduciary duty for purposes of her common law claims, because no fiduciary duty is owed to employees.  *See Rather v. CBS Corp.*, 68 A.D.3d 49, 55, 886 N.Y.S.2d 121, 125 (2009).

Ex. 1 § 5.) "The rights and obligations of partners, as between themselves, are fixed by the terms of the partnership agreement…If complete, as between the partners, the agreement so made controls." *Furman v. Cirrito*, 828 F.2d 898, 901 (2d Cir. 1987). There can be no breach of a fiduciary duty when a defendant can demonstrate that it acted pursuant to the rights agreed upon in a partnership agreement. *See id.* (affirming that plaintiff failed to demonstrate any evidence of wrongdoing by defendants where they acted pursuant to their authority under the parties' partnership agreement); *Ray Legal Consulting Group v. DiJoseph*, 37 F. Supp. 3d 704, 728-29 (S.D.N.Y. 2014) (law firm did not breach its fiduciary duty to plaintiff where it acted in accordance with its obligations under a confidentiality agreement); *Cooper Development Co. v. Friedman*, No. 92 Civ. 7572 (JSM), 1994 WL 62846, at *5 (S.D.N.Y. 1994) ("fiduciary obligations owed by partners are defined by the partnership agreement….its terms are enforceable and broad notions of fiduciary duty will not override its provisions.") *See also Day v. Sidley & Austin*, 394 F. Supp. 986, 994 (D.D.C. 1975) (partner's fiduciary duty claim dismissed where the agreement delegated to the Executive Committee authority concerning the merger the partner contested.). Therefore, in the absence of a breach of the Partnership Agreement, Doe cannot possibly assert that the Firm breached a fiduciary duty owed to her.

### 3. A Breach of Fiduciary Duty Claim Cannot Arise From Alleged Violation of An Ethical Rule

The Court should dismiss Plaintiff's fiduciary duty claim based upon an alleged violation of an ethical rule, for even if it had actually occurred, it would not give rise to a claim for breach of fiduciary duty. Doe contends that the Firm violated the New York and District of Columbia Rules of Professional Conduct by allegedly discriminating and/or retaliating against her. *See* Compl. ¶¶ 21-22, 27, 120-22. The ethical rules, however, do not create a private cause of action. *See* N.Y Rules of Professional Conduct Scope ("Violation of a Rule should not itself give rise to

a cause of action against a lawyer…[The Rules] are not designed to be a basis for civil

liability."); D.C. Rules of Professional Conduct ("Nothing in these Rules…is intended to enlarge

or restrict existing law….nothing in the Rules…is intended to confer rights on an adversary of a

lawyer to enforce the Rules in a proceeding other than a disciplinary proceeding."). Doe cannot

use a common law fiduciary duty claim as a vehicle to create a cause of action where one does

not exist. *See Renaud v. Young Men's Christian Ass'n Ret. Fund*, 2012 WL 363561, at *1

(S.D.N.Y. Feb. 3, 2012) (alleged violations of New York's Rules of Professional Conduct do not

give rise to a breach of fiduciary duty claim); *Sullivan & Cromwell LLP v. Charney*, 15 Misc. 3d

1128(A), at *5 (Sup. Ct., N.Y. Cty. Apr. 30, 2007) ("[u]nder New York law, an attorney's

violation of a disciplinary rule does not, by itself, give rise to a cause of action by his client for

breach of fiduciary duty"; finding that firm did not have a breach of fiduciary duty claim against

an associate who allegedly disclosed confidential and/or proprietary documents concerning the

firm)*; Margrabe v. Sexter & Warmflash P.C.*, 353 F. App'x 547, 549 (2d Cir. 2009) (even if

party breached a disciplinary rule by disclosing a client's letter containing a client

confidence/secret, "an attorney's breach of a disciplinary rule does not *per se* give rise to a cause

of action for breach of fiduciary duty").

Moreover, as explained above, Plaintiff is barred from bringing statutory causes of action

under federal and state statutes based on identical allegations of discrimination and retaliation

because she is not an "employee." She should not be able to use the ethical rules, which also

address discrimination as it pertains to *employment*, to circumvent such a threshold requirement.

*See* N.Y. Rule of Prof. Conduct 8.4(g); D.C. Rule of Prof. Conduct 9.1; *Weir*, 34 Misc. 3d

1207(A), at *8 (dismissing breach of fiduciary duty claim brought by law firm partner because

cause of action was duplicative of statutory discrimination claims, which were dismissed because plaintiff was not an "employee" within the meaning of the anti-discrimination laws).[20]

### D. Doe's Unjust Enrichment Claim Fails Because Her Rights Are Governed by An Express Contract

To establish an unjust enrichment claim under New York law, Doe must show that (1) the defendant received a benefit, (2) at the plaintiff's expense, and (3) permitting defendant's retention of the benefit would be against equity and good conscience. *Smith v. Mikki More, LLC*, 59 F. Supp. 3d 595, 614 (S.D.N.Y. 2014).   However, "where a valid agreement requires a plaintiff to perform the very services on which [she] bases [her] unjust enrichment claim, the unjust enrichment claim will fail." *Morgenweck v. Vision Capital Advisors, LLC*, 2010 WL 9478990, at *5 (S.D.N.Y. June 3, 2010); *see also Atlantis Info. Tech.*, 485 F. Supp. 2d at 224 (dismissing unjust enrichment claim where written contract governed the same subject matter).

Here, there is no dispute that a valid Partnership Agreement exists.   Indeed, the Agreement is the cornerstone of Doe's Complaint.   Her unjust enrichment claim is that, while allegedly reaping the benefits of her work, the Firm "failed to pay Doe all compensation due to her as a Partner." (Compl. ¶¶ 137-138.)   This is the mirror image of Doe's breach of contract claim, in which she takes issue with the Firm's alleged "profit allocation decisions" under the Partnership Agreement. (*Id.* ¶ 126.)   As such, her unjust enrichment claim must be dismissed.

---

[20] The result would be the same under District of Columbia law.   Courts in this Circuit recognize that "not *every* violation of *every* ethical rule constitutes a breach of fiduciary duty[.]" *Jacobsen v. Oliver*, 555 F. Supp. 2d 72, 88 (D.D.C. 2008) (emphasis in original).   Here, where the facts do not give rise to an ethical rule violation because (1) the Firm acted in accordance with the Partnership Agreement, and (2) Doe is not an "employee" of the Firm, a cause of action for breach of fiduciary duty that is based entirely on such ethical rules cannot survive.

### E.   Doe Fails to State A Claim for Fraudulent Misrepresentation

Doe has not stated a claim that rises nearly to the level of fraudulent misrepresentation.

Under New York law, a plaintiff must allege "a misrepresentation or a material omission of fact

which was false and known to be false by the defendant, made for the purpose of inducing the

other party to rely upon it, justifiable reliance of the other party on the misrepresentation or

material omission, and injury." *Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1108

(N.Y. 2011).  Moreover, claims of fraud must be pled with particularity and "(1) detail the

statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3)

state where and when the statements (or omissions) were made, and (4) explain why the

statements (or omissions) are fraudulent." *Ellington Credit Fund, Ltd. v. Select Portfolio

Servicing, Inc.*, 837 F. Supp. 2d 162, 197 (S.D.N.Y. 2011) (internal citation omitted).[21]  In

addition, a cause of action for fraud should be dismissed if the "only fraud charged related to a

breach of contract."  *Id.*

### 1.  Doe's Allegations Are Insufficient to Support a Claim of Fraud

It is well settled that a claim for fraudulent misrepresentation must be based upon the

misrepresentation of an existing fact, not a statement of future intention.  *See PetEdge, Inc. v.

Garg*, -- F. Supp. 3d--, 2017 WL 564088, at *10 (S.D.N.Y. Feb. 10, 2017) (granting defendant's

motion to dismiss; "false statements indicating an intent to perform under a contract are

insufficient to support a claim for fraud").  Moreover, mere speculation about a future event or

---

[21] Choice of law would not affect the outcome here.  The elements of a fraudulent
misrepresentation claim under District of Columbia law are nearly identical to those under New
York law. *See Falconi-Sachs v. LPF Senate Square, LLC*, 142 A.3d 550, 555 (D.C. 2016).
Similarly, D.C. courts apply a heightened pleading standard to fraud claims that requires that a
plaintiff state "the time, place, and content of the false misrepresentations, the fact
misrepresented and what was retained or given up as a consequence of the fraud." *Baker v.
Gurfein*, 744 F. Supp. 2d 311, 315-16 (D.D.C. 2010).

an expression of hope is not actionable as fraud because it is not a representation as to existing facts. *See Albert Apartment Corp. v. Corbo Co.*, 182 A.D.2d 500, 501 (1st Dep't 1992) (holding that "speculation and expressions of hope for the future do not constitute actionable representations of fact") (citation omitted); *see also Tutak v. Tutak*, 123 A.D.2d 758, 760 (2d Dep't 1986) (fraud "may not be based upon a statement of future intentions, promises or expectations which were speculative, or an expression of hope at the time when made").

Doe does not and cannot allege any material misrepresentation of an existing fact giving rise to her fraudulent misrepresentation claim. The Partnership Agreement provides only that the Executive Committee shall allocate and distribute profits among the partners. (Leccese Decl. ¶ 16, Ex. 1 § 5(c).) It does not guarantee Doe any particular allocation of the profits. The oral statements allegedly made to Doe both before and after she joined the partnership that she "would quickly move up" in annual allocations "*if*" she generated certain revenue (Compl. ¶ 31 (emphasis added)), and that she "*should* anticipate substantial [allocation] increases *in the future*" (*id.* ¶ 33 (emphasis added)) are not representations of existing fact. Reading the Complaint in the light most favorable to Doe, these alleged oral statements reflect a future aspiration to allocate more of the Firm's profits (unknown at the time) to Doe based on her own revenue generation (also unknown at the time), which was always subject to the discretion of the Executive Committee under the terms of the Partnership Agreement into which Plaintiff, an experienced lawyer, entered. Moreover, the individual agreement Doe signed with the Firm undermines any possible claim that she was fraudulently induced into joining the Firm. (Leccese Decl. ¶ 47, Ex. 10.) In that Agreement, Doe agreed that if she generated annualized accrued revenue of $7 million or more in fiscal year 2013, from which collections were in the normal range, as determined by the Executive Committee, she would receive an annualized partner

allocation, including signing bonus, of not less than $███████ for 2013 (prorated for the

portion of the year she was a partner in the Firm) (*id.* ¶¶ 48-49, Ex. 10), which is far less than

what she claims she was told in paragraph 31 of the Complaint.

### 2. Doe's Claim is a Breach of Contract Claim "Masquerading" As a Fraud Claim

Doe's fraudulent misrepresentation claim is also duplicative of her breach of contract

claim.  In order to distinguish a fraud claim from a breach of contract claim, a plaintiff must

demonstrate:  (1) a legal duty separate from the duty to perform under the contract, (2) a

fraudulent misrepresentation that is collateral or extraneous to the contract, or (3) that she seeks

special damages caused by the misrepresentation that she cannot recover under her breach of

contract claim.  *Ellington*, 837 F. Supp. 2d at 198 (citing *Bridgestone/Firestone, Inc. v. Recovery*

*Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir. 1996)).

Here, all of the rights and obligations among Doe and her partners concerning the

allocation of Firm profits are governed by the terms of the Partnership Agreement.  Thus, Doe

cannot satisfy the first prong.  Additionally, there is nothing that is extraneous or collateral to the

Partnership Agreement underlying Doe's claim.  Doe claims that the Firm promised it would

raise her allocations to specific levels, but merely intended to "induce" her to join the Firm.

These types of allegations that a defendant never intended to fulfill its promises are redundant of

a breach of contract claim, and should be dismissed.  *See Telecom Int'l Am., Ltd. v. AT&T Corp.*,

280 F.3d 175, 196 (2d Cir. 2001) (dismissing fraudulent inducement claim where "it is simply a

breach of contract claim in the tort clothing of (factually unsupported) allegations of an intent to

breach.").  Doe merely attempts to recast in tort contract allegations that take issue with her

profit distributions under the Agreement.

Third, the damages Doe seeks to recover for alleged fraudulent misrepresentation mirror the damages she seeks to recover for alleged breach of contract – "compensation that she was promised when she joined the Firm," *i.e.* a larger allocation of the Firm's profits than she received. (Compl. ¶ 135.). Those are not, however, special damages that "seek to compensate a plaintiff for losses other than the value of the promised performance that are incurred as a result of the defendant's breach." *C3 Media & Marketing Group LLC v. Firstgate Internet, Inc.*, 419 F. Supp. 2d 419, 430-31 (S.D.N.Y. 2005) (holding, also, that special damages must be plead with particularity) (internal quotation marks and citations omitted); *J.E. Morgan Knitting Mills v. Reeves Bros., Inc.*, 243 A.D.2d 422, 423 (1st Dep't 1997) (dismissing fraud claim where plaintiff did not allege damages that would not be recoverable under a breach of contract theory). Because Doe's fraud claim is based upon her allegations that the Firm did not compensate her appropriately under the Partnership Agreement, it should be dismissed as a matter of law. *See Weir*, 34 Misc. 3d 1207(A), at *10 (dismissing law firm partner's fraudulent misrepresentation claim where he alleged that firm and its partners "defrauded plaintiff of substantial monetary compensation" because the allegations were the same as plaintiff's breach of contract claim); *W.B. David & Co., Inc. v. DWA Commc'ns, Inc.*, No. 02 Civ. 8479 (BSJ), 2004 WL 369147, at *4 (S.D.N.Y. Feb. 26, 2004) (dismissing fraudulent misrepresentation claim where the alleged misrepresentations related to a core issue in the written agreement between the parties).

## CONCLUSION

Putting aside the complete lack of merit to Plaintiff's allegations against her partners, her lawsuit cannot survive due to the numerous fatal legal flaws in her Complaint. Therefore judgment should be entered for the Defendant and the case should be dismissed with prejudice.

Dated: June 13, 2017

Respectfully submitted,

PROSKAUER ROSE LLP

/s/ Colin Kass
Colin Kass (DC Bar No. 460630)
1001 Pennsylvania Avenue, N.W.
Suite 600 South
Washington, D.C. 20004
Telephone:  (202) 416-6890
Facsimile:   (202) 416-6899
Email:  ckass@proskauer.com

Kathleen M. McKenna* (KM-4258)
Steven E. Obus* (SO-9791)
Evandro C. Gigante* (EG-7402)
Eleven Times Square
New York, New York 10036

*Counsel for Defendant*
Proskauer Rose LLP


*pro hac vice* application pending

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

------------------------------------------------------------ x

JANE DOE,                                                  :
                                                           :
                              Plaintiff,                   :
                                                           :
                  v.                                       :       Civil Action No. 17-00901 (ABJ)
                                                           :
PROSKAUER ROSE LLP,                                        :
                                                           :
                              Defendant.                   :
------------------------------------------------------------ x

### DEFENDANT'S STATEMENT OF MATERIAL FACTS
### AS TO WHICH THERE IS NO GENUINE ISSUE

Pursuant to Local Civil Rule 7(h)(1), Defendant Proskauer Rose LLP ("Proskauer" or

the "Firm") respectfully submits this Statement of Material Facts as to Which There Is No

Genuine Issue in support of its Motion for Summary Judgment and Motion to Dismiss with

respect to the claims asserted by its partner, Plaintiff "Jane Doe" ("Plaintiff" or "Doe").

### The Firm

1.    Proskauer is an international law firm of approximately 740 lawyers in 13 offices

around the world.  (Declaration of Joseph M. Leccese, Esq., dated June 13, 2017 ("Leccese

Decl.") ¶ 3.)

2.    Plaintiff Doe practices in the ▇▇▇▇▇▇▇▇▇▇ Department, for which Proskauer is

particularly well known.  (*Id.*)

### The Firm's Partnership Agreement

3.    Proskauer is a New York limited liability partnership.  (*Id.* ¶ 6.)

4.    The relationships among its partners are governed by the Firm's Restated Partnership

Agreement dated October 12, 2011, as amended (the "Partnership Agreement").  (*Id.*)

5.   The Partnership Agreement is governed by New York law.  (*Id.* ¶ 7; Ex. 1 § 23.)[1]

6.   The Firm's principal office is located in New York, and the Firm maintains twelve other offices, including an office in Washington, D.C.  (Leccese Decl. ¶ 7; Ex. 1 § 4.)

7.   The Firm does not maintain an office in Maryland.  (Leccese Decl. ¶ 7.)

8.   The Firm has two types of active partners:  equity partners and income partners.  (*Id.* ¶ 8.)

9.   Doe is an equity partner.  (*Id.*)

10.   The term "regular partner" in the Partnership Agreement means an equity partner.  (*Id.*)

11.   The term "contract partner" in the Partnership Agreement includes both equity partners whose relationship with the Firm is governed in part by a separate agreement with the Firm and income partners whose rights are different than equity partners.  (*Id.*; Ex. 1 § 3.)

12.   Each equity partner of the Firm, including Doe, has agreed to the Firm's Partnership Agreement.  (Leccese Decl. ¶ 9.)

13.   The rights and obligations of all equity partners are governed by the Partnership Agreement, except to the extent specifically modified by an individual agreement between the partner and the Firm.  (*Id.*; Ex. 1 § 3.)

### Equity Partner Voting on Firm Affairs

14.   The Partnership Agreement provides for a "weighted vote" system in which each equity partner has three votes and, on matters on which they are entitled to vote, each income partner has one vote.  (Leccese Decl. ¶ 10; Ex. 1 § 6(e).)

15.   Under Section 6 of the Partnership Agreement, a 75% vote of the partners is required in order to: (i) admit new partners to the Firm; (ii) amend the Partnership Agreement; (iii) change

---

[1]  All references to numbered exhibits refer to the exhibits to the accompanying Leccese Declaration.

the name of the Firm; (iv) establish additional Firm offices; or (v) vote on any other matter submitted to a vote of the partners by the Executive Committee or by 25% of the Firm's partners (unless a lesser vote has been specified in the Partnership Agreement). (Leccese Decl. ¶ 11; Ex. 1 §§ 6(a)(i)-(vi), 9.)

16.   The Firm's principal office can be relocated upon a two-thirds vote of all equity partners in which each equity partner is entitled to one vote. (Leccese Decl. ¶ 11; Ex. 1 § 4.)

17.   The Partnership Agreement requires that partners vote to approve all decisions to (i) expel a partner from the Firm upon the recommendation of the Executive Committee; (ii) merge with another law firm; or (iii) terminate the partnership, with a 75% weighted vote of all partners entitled to vote required to approve such actions.   (Leccese Decl. ¶ 12; Ex. 1 §§ 6(a)(x)-(z).)

18.   The Partnership Agreement provides for meetings of the partners at least monthly to discuss or decide matters that require a decision by the partners and at which decisions made by the Executive Committee are reported to the partners. (Leccese Decl. ¶ 13; Ex. 1 § 5(e).)

19.   Any partner may request that a matter be placed on the agenda of the partners' meeting for discussion among the partners. (*Id.*)

### The Firm's Executive Committee

20.   Pursuant to the Partnership Agreement, the Firm's partners have conferred on the Executive Committee responsibility for "matters of management, policy and operations." (Leccese Decl. ¶ 14; Ex. 1 § 5(c).)

21.   The Partnership Agreement provides that the Executive Committee's authority to manage the operations of the Firm "derives from and is delegated by the partners." (Leccese Decl. ¶ 14; Ex. 1 § 5(a).)

3

22.   The Partnership Agreement provides that any and "[a]ll authority not delegated [to the Executive Committee under the Partnership Agreement] is retained by the partners." (*Id.*)

23.   The Partnership Agreement states that "if by the express terms of [the Partnership] Agreement any matter is to be determined by the Executive Committee or by decision of the partners . . . it shall be so determined or decided, and every such determination or decision shall be final and binding for purposes of this Agreement and not subject to review or modification in any arbitration or judicial proceeding." (Leccese Decl. ¶ 15; Ex. 1 § 22.)

24.   As set forth in the Partnership Agreement, the Executive Committee's responsibilities include the:

> (i) determination of fees, profits, expenses, and accounting practices, (ii) allocation of profits among and distribution of profits to the partners, (iii) authorization of banking and safe deposit accounts and signatures, (iv) incurring of capital expenditures, (v) investing funds of the Partnership, (vi) borrowing on behalf of the Partnership, (vii) hiring and discharging of employees, (viii) determinations regarding acceptance of client representation and resolution of conflicts arising in the course of such representation, (ix) determination of all matters relating to the Firm's insurance and its pension, group life and other plans, (x) equipment and other purchases, (xi) negotiation and execution on behalf of the Partnership of all leases and contracts, (xii) interpretation of this Agreement and (xiii) all other matters as to which no other or inconsistent provision has been made in this Agreement.

(Leccese Decl. ¶ 16; Ex. 1 § 5(c).)

25.   Under the Partnership Agreement, the Executive Committee may appoint other committees to assist in carrying out its functions, and it also appoints chairpersons to head each of the Firm's departments after giving due consideration to the views of the partners in each department. (Leccese Decl. ¶ 17; Ex. 1 § 5(b), (f).)

26.   Although the Executive Committee has the authority to manage the Firm's affairs under the Partnership Agreement, the Executive Committee is also required to submit to the partners

4

any matter that three Executive Committee members "deem of sufficient importance to merit discussion or decision by the partners." (Leccese Decl. ¶ 18; Ex. 1 § 5(c).)

27.   The Executive Committee can—and, at times does—ask the partners to vote on matters that the Executive Committee would otherwise have the authority to decide on its own. (Leccese Decl. ¶ 18.)

28.   Under the Partnership Agreement the Executive Committee must report to the partners—as it does in monthly meetings—on decisions made by the Executive Committee on behalf of the Firm. (Leccese Decl. ¶ 18; Ex. 1 § 5(e).)

29.   The Executive Committee consists of seven members, including the Firm's Chair. (Leccese Decl. ¶ 19; Ex. 1 § 7(a)(1).)

30.   The Firm's partners elect the Executive Committee members and the Chair through the weighted voting procedure described above. (Leccese Decl. ¶ 19; Ex. 1 § 6(c).)

31.   Elections are conducted by secret ballot and partners may vote in person or by proxy. (Leccese Decl. ¶ 19; Ex. 1 § 6(g), Exhibit A.)

32.   A candidate who receives a majority of the votes cast is elected to the position. (Leccese Decl. ¶ 19; Ex. 1 § 6(c).)

33.   All equity partners, including Doe, are eligible to run for Chair or a seat on the Executive Committee. (Leccese Decl. ¶ 20; Ex. 1 § 5(b), 7(c).)

34.   There is no nominating committee that controls who runs for a position. (Leccese Decl. ¶ 20.)

35.   Each equity partner is simply asked whether s/he wishes to have her/his name included on the ballot for election to the position. (Leccese Decl. ¶ 20; Ex. 1 Exhibit A, ¶ 2.)

5

36.   If s/he wants to be included, then her/his name will be shown on the ballot.  (Leccese Decl. ¶ 20; Ex. 1 Exhibit A, ¶¶ 4, 5.)

37.   The Chair presides at partner meetings and Executive Committee meetings, and serves a three-year term.  (Leccese Decl. ¶ 21; Ex. 1 §§ 5(d), 7(a)(2).)

38.   Executive Committee members also serve three-year terms, which are staggered so that two of the six members' terms expire each year.  (Leccese Decl. ¶ 21; Ex. 1 § 7(a)(2)-(3).)

39.   Executive Committee members, other than the Chair, may not serve consecutive terms.  (Leccese Decl. ¶ 22; Ex. 1 § 7(a)(3).)

40.   With limited exceptions, no more than two partners on the Executive Committee can be from any one department, and none of the Firm's offices may have more than six members on the Executive Committee, including the Chair.  (Leccese Decl. ¶ 22; Ex. 1 § 7(a)(5).)

41.   In 2014 and 2015, two of the seven Executive Committee members were women.  (Leccese Decl. ¶ 22.)

42.   In 2016, one of the seven Executive Committee members was a woman.  (*Id.*)

### Allocation of Profits and Losses Among Equity Partners; Capital Contributions

43.   The Firm's equity partners, including Doe, share in the profits and losses of the Firm.  (Leccese Decl. ¶ 23; Ex. 1 § 11.)

44.   The Firm's equity partners also contribute capital to the Firm annually in an amount equal to 7% of their share of the Firm's profits for the year, subject to certain limitations.  (Leccese Decl. ¶ 23; Ex. 1 § 12(a).)

45.   Equity partners are entitled to a return on their capital at a rate fixed by the Executive Committee.  (Leccese Decl. ¶ 23; Ex. 1 § 12(b).)

46.    Employees of the Firm do not make capital contributions and are not charged with any portion of the Firm's losses.  (Leccese Decl. ¶ 23.)

47.    The Partnership Agreement requires that "[t]he profits of the Firm each year shall be allocated among the partners by the Executive Committee," and that "[i]f the Firm shall incur net losses, such net losses shall be chargeable to the partners in such a manner as is determined by the Executive Committee...."  (Leccese Decl. ¶ 24; Ex. 1 § 11.)

### Partner Allocations

48.    Proskauer does not have "points" or "shares" or any metrics that "entitle" a partner to any particular level of allocation in a given year.  (Leccese Decl. ¶ 25.)

49.    Rather, the Executive Committee annually undertakes a year-end review of each partner's performance on a host of quantitative and qualitative factors related to both short- term and long-term contributions.  (*Id.*)

50.    In conducting its annual allocation process, the Executive Committee takes into account the myriad ways in which partners contribute to the Firm's success.  (Leccese Decl. ¶ 26.)

51.    The Executive Committee sends an annual memorandum to all equity partners addressing the allocation of profits for the preceding fiscal year.  (Leccese Decl. ¶ 27; Ex. 2, Ex. 3, Ex. 4, Ex. 5.)

52.    Each year Doe was a partner, the Executive Committee emphasized in its annual memorandum (which was sent to Doe and all other equity partners) that in determining allocations it "did not make any decisions – up or down – based on a single year's performance" (Ex. 2 at 2, Ex. 3 at 4) and that it did not base allocations on "the vagaries of a single year" (Ex. 4 at 9, Ex. 5 at 7).  (Leccese Decl. ¶ 28.)

53.   Rather, the Executive Committee made clear that it "rigorously examined three-year (and longer) averages and the totality of each partner's long term contributions" (Ex. 2 at 2, Ex. 3 at 4) and that it made allocation decisions "based on the totality of that partner's contribution over a period of years" (Ex. 4. at 9, Ex. 5 at 7).  (Leccese Decl. ¶ 28.)

54.   In other words, partner allocations are not tied to one year's financial performance, but take into account the totality of the partner's contributions over several years.  (*Id.*)

55.   Similarly, the Executive Committee has advised the Firm's equity partners that "no metric should be viewed as dispositive," and "each has its limitations."  (Leccese Decl. ¶ 29; Ex. 2 at 4, Ex. 3 at 5.)

56.   It is the Executive Committee's role to "carefully assess all metric and non-metric information."  (Leccese Decl. ¶ 29; Ex. 2 at 4.)

57.   In explaining to partners the review it undertakes each year, the Committee has stressed "the laborious and nuanced process we go through in attempting to understand more fully the entirety of each partner's contributions to our collective well-being, the fairness of relative placement and the importance of all the factors not reflected on [the allocation] schedule, including the non-metric factors set forth in the statement of Our Fundamental Partnership Values."  (Leccese Decl. ¶ 30; Ex. 2 at 5, Ex. 3 at 6, Ex. 4 at 11, Ex. 5 at 9.)

58.   Those values include, among other things, acting as a business owner and fiduciary, practicing at the highest level of quality and integrity, abiding by ethical and legal standards, operating as a consummate team player, adhering to sound practice management, sharing credit with others and ensuring that the Firm prospers for future generations.  (Leccese Decl. ¶ 31.)

59.   The Firm's Fundamental Partnership Values are communicated to the Firm's equity partners each year in a pre-allocation memorandum.  (Leccese Decl. ¶ 31; Ex. 6.)

8

60.   As the Executive Committee emphatically repeated each year Doe was a partner:

> If metrics were all that counted we could simply ask a member of
> the finance staff to multiply one or more of the metric columns by
> a percentage. The allocation process would take only hours but
> would invariably lead to a ruinous focus on limited, and often
> inadequate, measures of contribution.... [I]t is a disservice to the
> process, when partners . . .  form adverse judgments about the
> allocations made to others solely by comparing the metrics.

(Leccese Decl. ¶ 32; Ex. 2 at 5, Ex. 3 at 6-7, Ex. 4 at 11, Ex. 5 at 9.)

61.   The annual allocation process begins each year with the distribution of the pre-allocation memorandum to all partners in early to mid-October.  (Leccese Decl. ¶ 33, Ex. 7, Ex. 8, Ex. 9.)

62.   The Firm's fiscal year runs from November 1 to October 31.  (Leccese Decl. ¶ 33, n.1; Ex. 1 § 10.)

63.   In the pre-allocation memorandum, the Executive Committee invites partners to submit memoranda outlining their contributions to the Firm and the contributions made by their colleagues.  (Leccese Decl. ¶ 33.)

64.   As the Executive Committee has explained, partner memos "provide valuable information [to the Committee] on a variety of economic and non-economic matters that cannot be measured solely by the year-end metrics available to us."  (Leccese Decl. ¶ 34; Ex. 7 at 1, Ex. 8 at 1, Ex. 9 at 1.)

65.   The annual memoranda prepared by partners are sent not only to the Executive Committee, but also to the partner's Department Chairs and office heads for review and discussion.  (Leccese Decl. ¶ 35.)

66.   Although the Department Chairs and office heads do not set allocations for the Firm's partners, they are available to meet with each partner to review his/her memorandum and discuss any questions, issues, concerns or other information that the partner may wish to raise in advance

of the Firm's annual allocation decisions, and Department chairs and office heads provide input to the Executive Committee for its consideration with respect to those decisions. (*Id.*)

67.   After partner memos are submitted to the Executive Committee for consideration, members of the Executive Committee make themselves available to meet with any partner who wishes to discuss his/her contributions, as well as the contributions of other partners. (Leccese Decl. ¶ 36.)

68.   Following these meetings between members of the Executive Committee and any partner who wishes to discuss his/her contributions, as well as the contributions of other partners, and after the Executive Committee has considered each partner's contributions to the Firm, the Committee makes final allocation decisions and communicates those decisions to the partners in December of each year. (*Id.*)

69.   In accordance with Section 22 of the Partnership Agreement, such allocation decisions – which are entrusted to the Executive Committee by the partners – are "final and binding for purposes of [the Partnership] Agreement and not subject to review or modification in any arbitration or judicial proceeding." (Leccese Decl. ¶ 37; Ex. 1 § 22.)

70.   Each of the Firm's equity partners receives a report each December specifying the allocation paid to each partner and reflecting various metrics applicable to each partner – including cash collected per hour worked by the partner, revenue from clients originated by the partner, revenue from clients for which the partner had relationship responsibility, revenue from client matters for which the partner had responsibility, revenues from matters on which the partner worked, the realization rates associated with such revenue, and hours billed. (Leccese Decl. ¶ 38.)

71.   The report provides data for each of those metrics for the immediately preceding year and as an average for the three preceding years.  (*Id.*)

72.   In addition, the individual partner memoranda prepared by each partner are available for review by all partners after the allocation process is complete.  (*Id.*)

73.   Realization, as measured at Proskauer, includes two different metrics – one that approximates the fees collected as a percentage of the fees accrued at specified rates on client matters, and a second that reflects a "hypothetical" realization that approximates the fees collected as a percentage of the fees that would have accrued at rates attorneys should reasonably charge for their services based on their years of experience. (*Id.* ¶ 39.)

74.   Equity partners are responsible for paying their own individual taxes on allocated Firm income.  (*Id.* ¶ 40.)

75.   The allocations paid to equity partners are reported on a Schedule K-1, which is the IRS Schedule used to report profits and losses of self-employed business owners of a partnership. (*Id.*)

## The Firm's Partners Operate as Business Owners

76.   Among other things, the Firm's partners have broad latitude in bringing business into the Firm, subject to the Firm's conflicts procedures, billing and collection guidelines, risk management and similar policies, all of which are set by the Executive Committee pursuant to the express grant of authority in the Partnership Agreement.  (*Id.*)

77.   The partnership has vested in the Executive Committee the authority to "determin[e] the fees, profits, expenses, and accounting practices of the Firm", as well as the authority to make "determinations regarding acceptance of client representations and resolution of conflicts arising in the course of such representations." (Leccese Decl. ¶ 41, n.2; Ex. 1 § 5(c).)

11

78.   Subject to the Executive Committee's policy determinations, the Firm's equity partners, including Doe, have discretion over the manner in which they provide services to the Firm's clients and manage their work, and they are not subject to oversight or supervision by the Executive Committee.  (Leccese Decl. ¶ 42.)

79.   In the case of litigators like Doe, for example, partners routinely advise clients on litigation avoidance, confer with clients on litigation strategy and file court documents, all without any oversight by the Executive Committee.  (*Id.*)

80.   The Firm's associates or other Firm employees are subject to supervision by the Firm, including by the partners (such as Doe) who oversee client matters.  (Leccese Decl. ¶ 43.)

81.   The Firm's partners also have wide-ranging access to the Firm's financial information. (Leccese Decl. ¶ 44.)

82.   Pursuant to Section 5(e) of the Partnership Agreement, partners are entitled to financial information and other materials to be discussed at monthly partner meetings (Ex. 1 § 5(e)); and detailed financial data – including revenue, billings, collections, hours and other metrics – is presented to all partners during monthly partnership meetings.  (Leccese Decl. ¶ 44.)

83.   Access to Firm financial data is available to equity partners through the Partner Portal on the Firm's intranet.  (*Id.*)

84.   All equity partners receive, at the time of profit allocations, annual and 3-year average data on partner allocations, cash collected per hour worked, four categories of revenue credit, and realization rates for each partner of the Firm.  (Leccese Decl. ¶ 45.)

85.   In addition to having the right to cast three votes in partnership votes, equity partners also have extensive access to individual allocations and other financial metrics on their fellow partners.  (*Id.*)

86.   Income partners and other employees of the Firm are not given access to this financial information about equity partners.  (*Id.*)

### Doe's Tenure with the Firm

87.   Doe joined Proskauer as an equity partner in the  Department in ████ 2013, and has been a partner for the past four years in the Firm's Washington D.C. Office. (Leccese Decl. ¶ 46.)

88.   Doe came to the Firm after having spent ████ as a partner at ████ and ████████ as a partner at ████. (*Id.*)

89.   Like all prospective partners, Doe's admission to the partnership was subject to approval by a vote of the partners.  (*Id.*)

90.   After a presentation to the equity partners at a partnership meeting, the equity partners voted to admit Doe as an equity partner.  (*Id.*)

91.   Upon joining the Firm, Doe agreed to the Partnership Agreement.  (*Id.*)

92.   When Doe joined the Firm, in addition to agreeing to the Partnership Agreement, she and the Firm agreed that while she would be a regular equity partner for all other purposes, her allocation would be guaranteed for 2013 and, subject to certain terms and conditions, her membership in the Firm could be terminated by the Executive Committee either for cause or not for cause. (Leccese Decl. ¶ 47; Ex. 10.)

93.   Since joining the Firm, Doe has received annual allocations from the Firm's profits. (Leccese Decl. ¶ 48.)

94.   For the balance of the Firm's 2013 fiscal year (i.e., through October 31), Doe's allocation was in accordance with the individual agreement she entered into with the Firm.  (*Id.*)

Specifically, Doe received a pro rata portion of $███████, which was comprised of pro rata

portions of $██████ and a $██████ signing bonus. (*Id.*)

95.  For 2014, Doe's profit allocation of $███████ represented a ██% increase over the

allocation she received for 2013. (Leccese Decl. ¶ 49.)

96.  The average increase for full-year equity partners for 2014 was approximately only ██%.

(*Id.*)

97.  For 2015, Doe's allocation of $███████ represented a ██% increase over 2014. (*Id.*)

98.  The average increase for full-year equity partners for 2015 was approximately only ██%.

(*Id.*)

99.  Doe was one of the six highest paid partners in the ██████████████ Department

for 2015, of whom three are male and three are female. (*Id.*)

100.  For 2016, Doe's allocation was increased to $███████, an ██% increase over 2015.

(Leccese Decl. ¶ 50.)

101.  The average increase for full-year equity partners for 2016 was approximately ██%.

(*Id.*)

102.  Doe was the fifth highest paid partner in the ██████████████ Department for

2016. (*Id.*)

103.  Doe routinely files court documents and advises clients both pre- and during litigation

without oversight by the Executive Committee or any of her other co-owners. (Leccese Decl. ¶

51.)

104.  Doe generates client relationships and performs legal work for clients in her discretion

subject to the general policies concerning conflicts, risk and billing established by the Firm's

elected Executive Committee for the collective benefit of the partners and the Firm. (*Id.*)

14

105.  Doe sets her own priorities and schedule, determining, for example, whether and when she will spend her time pursuing business from existing clients or prospective clients, and when, and even where, she will perform the legal work for which she is retained by those clients. (Leccese Decl. ¶ 52.)

106.  The Firm's associates and other staff are subject to supervision, including by Doe, who oversees client matters and serves as the head of the Firm's ██████████████████ Group and co-head of the Firm's ██████████████████ practice group.  (Leccese Decl. ¶ 53.)

107.  Doe has never requested "leave" from the Firm.  (Leccese Decl. ¶ 54.)

108.  Like all equity partners, she may come and go as she sees fit, provided that she meets her professional responsibilities to clients.  (*Id.*)

109.  Doe has taken time away from the Firm for her health and welfare without seeking permission from anyone.  (*Id.*)

110.  Throughout her tenure with the Firm, Doe's allocation of partnership profits has been reported on an IRS Schedule K-1 (used to report partner income), not a Form W-2 (used to report employee wages).  (Leccese Decl. ¶ 55.)

111.  Doe's K-1's indicate that her residence is in ██████ .  (*Id.*)

112.  Doe has complete information about other equity partners' allocations, and access to comprehensive financial information about the Firm's performance and substantial information regarding other equity partners' contributions.  (*Id.* ¶ 56.)

113.  The Firm's income partners and employees do not have access to the information available to equity partners about every equity partners' allocations.  (*Id.*)

Dated: June 13, 2017                            Respectfully submitted,

                                            PROSKAUER ROSE LLP

                                            /s/ Colin Kass
                                            Colin Kass (DC Bar No. 460630)
                                            1001 Pennsylvania Avenue, N.W.
                                            Suite 600 South
                                            Washington, D.C. 20004
                                            Telephone:  (202) 416-6890
                                            Facsimile:  (202) 416-6899
                                            Email:  ckass@proskauer.com

                                            Kathleen M. McKenna* (KM-4258)
                                            Steven E. Obus* (SO-9791)
                                            Evandro C. Gigante* (EG-7402)
                                            Eleven Times Square
                                            New York, New York 10036

                                            *Counsel for Defendant*
                                            Proskauer Rose LLP

                                          **pro hac vice* application pending

16